# National Standards of Accreditation

## for Children's Advocacy Centers

2023 EDITION

**National Children's Alliance**®

*The Force Behind Children's Advocacy Centers*



This project was supported by grant #2018-CI-FX-K002 awarded by the Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice. The opinions, findings, and conclusions or recommendations expressed in this project are those of the presenters and do not necessarily reflect those of the Department of Justice.



**National Children's Alliance**®

*The Force Behind Children's Advocacy Centers*





# Table Of Contents

Introduction                                          4

Contributors                                          8

## Standards

01. Multidisciplinary Team Standard                   **13**

02. Diversity, Equity and Access of Services Standard **21**

03. Forensic Interview Standard                       **25**

04. Victim Support and Advocacy Standard              **31**

05. Medical Evaluation Standard                       **37**

06. Mental Health Standard                            **43**

07. Case Review and Coordination Standard             **49**

08. Case Tracking Standard                            **53**

09. Organizational Capacity Standard                  **57**

10. Child Safety and Protection Standard              **63**

Medical Appendix                                      67



# Guiding Principles

The Standards for Accreditation for Children's Advocacy Centers represent the evidence-supported core competencies of the Children's Advocacy Center (CAC) model. They are explicitly developed, revised, and guided by the diverse ways in which CACs are organized, sponsored, structured, staffed, resourced, and housed in accordance with the unique factors in their respective communities. Moreover, the Standards are explicitly developed with values of diversity, equity, and inclusion in mind.

With continued growth in CACs throughout the United States, the Standards also seek to balance the goal of serving greater numbers of children and families with the critical need to sustain the integrity of the CAC model and its associated professional credibility. Furthermore, National Children's Alliance (referred to hereafter as NCA) is committed to ensuring a fair, transparent, and equitable review process that recognizes the Standards as minimum standards of operation that are evidence supported, measurable, reviewed, and revised over time as research progresses and service needs evolve. In making the Standards measurable and the basis of measurement clear, NCA promotes the field's recognition of the importance the Standards have for ensuring the delivery of high-quality, relevant, and accessible services to children and families served by CACs.

# Purpose of the Standards for Accredited Members:

The Standards help ensure that all children across the U.S. served by Children's Advocacy Centers receive consistent evidence-based and evidence-supported interventions that help them pursue safety, healing, and justice. In addition, the Standards also have several secondary purposes:

1. to serve as a valuable roadmap for new CACs as they develop;

2. to assist existing CACs in improving their services to children and families;

3. to demonstrate the high-quality work of Accredited CACs to stakeholders; and

4. to provide a compass to guide CACs, MDTs, boards, and other stakeholders in strategic planning and through leadership transitions.

It is important to note that there is no hierarchy among the National Standards for Accreditation—all are equally important to the healthy functioning of a Children's Advocacy Center. Therefore, the order in this Standards document is not a rank ordering of importance. Careful attention should be given by CACs to each Essential Component, as they serve as a ladder of success to the Standard as a whole.



Case 4:22-cv-00017-SLG    Document 79-5    Filed 01/31/24    Page 4 of 78    **EXHIBIT E**
**Page 4 of 78**



# Standards Revision Process

NCA's Standards for Accredited Members are reviewed through a process coordinated by the Accreditation Department every five , consistent with the five-year period after which reaccreditation is required. NCA conducts regular reviews of the current Standards to ensure that they reflect relevant advances in evidence-based practices and are clear, concise, and set at appropriate thresholds.

The first step of the process was the commission and publication by NCA of the *Annotated Bibliography of the Empirical and Scholarly Literature Supporting the Standards for Accredited Members* (hereafter referred to as the "Annotated Bibliography"). It was first published in 2011, reviewed and republished in the 2013 second edition and, most recently, reviewed and republished again in a 2019 third edition. (Relevant research published in the interim period was reviewed and added to the draft bibliography.) Research support for all existing standards was identified, providing good evidence that the existing standards and extant research were in alignment and pointed in new areas in which an evidence base has now developed.

In addition to the 10 core CAC National Standards, and based on feedback from the field, NCA's Board of Directors directed the Standards revision process to determine whether sufficient evidence existed to establish practice standards and guide CAC services in Commercial Sexual Exploitation of Children (CSEC), Prevention, and Physical Abuse. Since every CAC does not provide these services, and yet practice standards are needed for those that do, the NCA Board determined that these three new standards will guide CAC services in these key areas at the discretion of the individual CAC seeking accreditation or reaccreditation. This means that these three Standards may be included in the review of site reviewers and CACs must opt-in for

such additional review. These topic areas are included in the 2019 third edition of the Annotated Bibliography.

Beginning in July 2020, NCA conducted a stakeholder survey of Accredited CAC members, accreditation site reviewers, Regional CAC leaders, State Chapter directors, and NCA Board members and staff seeking feedback on the existing Standards as well as requesting input on additional areas of inquiry. During this time, the NCA's Accreditation Department also reviewed accreditation outcome and evaluation data from the period between January 2017 and June 2020 to identify areas requiring further inquiry or clarification.

During the summer of 2020, NCA hired two independent consultants to review the current Standards for Accreditation through a diversity, equity, and inclusion (DEI) lens. They each made DEI-relevant recommendations for each of the current Standards and their corresponding essential components, which were shared throughout the rest of the revision process.

After the collection, review and approval of the final bibliography and the outcome and evaluation data, the Accreditation Committee convened seven Standards Task Forces to examine the following individual or groupings of related standards:

1. Organizational Capacity, Case Tracking, and Child Safety and Protection (formerly Child-Focused Setting);

2. Multidisciplinary Team, Case Review and Coordination (formerly Case Review), and Forensic Interview;

3. Equity, Access, and Inclusivity of Services (formerly Cultural Competency & Diversity) and Victim Services & Advocacy;



4. Medical Evaluation and Physical Abuse;

5. Mental Health;

6. Prevention; and

7. Commercial Sexual Exploitation of Children (CSEC).

Each Task Force was composed of subject matter experts and representatives from Regional CACs, Chapters, NCA member CACs, NCA site reviewers and NCA senior staff. Special care was taken to ensure that each Task Force included representatives who are experienced with CACs of diverse organizational structure, caseload, geography, and service population size and demographics. Each Task Force member also participated in a required implicit bias training prior to the first meetings held in October 2020. Each Task Force met monthly to discuss proposed revisions to their assigned Standards, completing this work in the spring of 2021.

A final review period of the full set of revisions was conducted in spring of 2021 by a Readers'

Pool selected from across all seven Task Forces. Feedback from the Readers' Pool and a DEI consultant was reviewed by NCA's Accreditation Department and senior staff. The final draft version of the revised Standards was submitted to NCA's Executive Committee, which reviewed it in May 2021 for any final revisions. It was then submitted to the full Board of Directors for a vote at their June 2021 meeting. At that time, the 2023 Edition of the Standards for Accredited Members was approved, and it was subsequently announced at NCA's 2021 Leadership Conference. This allows a number of months for CACs to complete their accreditation process before the revised Standards become effective for all CACs on January 1, 2023.

All CACs seeking accreditation for the first time, whether applying as a brand-new center or as a center in another membership category, will be reviewed and evaluated based on the Standards in effect during the year in which they apply. Accredited Centers will continue to need to engage in reaccreditation every five years on a rolling basis from their previous accreditation.

# Accreditation Process

CACs applying for new accreditation or reaccreditation begin by filling out a comprehensive application detailing how the center meets each Standard. This application must include the required documentation that demonstrates how it meets the Standards. NCA staff then screen the application for completeness and provide it to a two-person site review team. The two site reviewers will review the application, contact the CAC director, and send any questions or requests for additional information before the scheduled site visit.

The two-person site review team will conduct an on-site or virtual review within six months of submission of the application. The site review will include a meeting with board members, staff, and MDT members to review practices and documentation that demonstrate compliance with the Standards. Based upon their findings, the site review team completes a scoring form and makes a recommendation regarding the CAC's accreditation status.

NCA's Accreditation Department reviews pending status recommendations, which occur when the CAC is deemed to have had

deficits in one or more of the Standards. NCA's Board of Directors reviews the findings and, if in agreement, approves the site reviewer recommendations and awards accreditation. Centers are notified of the outcome of the review process at this time.

CAC's who are accorded pending status are given a one-year period to implement and document a corrective action plan that demonstrates compliance. At the end of this pending period, the corrective action plan documentation is reviewed by the original two site reviewers, the Accreditation Department, and NCA's Board of Directors. The Board makes the final determination regarding compliance and either awards or denies accreditation accordingly. Centers denied accreditation have the option to appeal the denial decision or begin a new accreditation process.





# Contributors

| Name | Employer |
| --- | --- |
| Abbie Newman, JD | Mission Kids Child Advocacy Center |
| Adebimpe Adewusi, MD | CARES Northwest |
| Althea Miller | Harford County Child Advocacy Center |
| Amelia Siders, Ph. D. | Children's Advocacy Centers of Michigan |
| Amy Russell, JD | Arthur D. Curtis Children's Justice Center |
| Antoinette Laskey, MD | University of Utah, Primary Children's Hospital |
| April Leming | Children's Advocacy Centers of Texas |
| Betti Mucha | Perry-Jackson Child Advocacy Center |
| Billie Larkin | NCA Site Reviewer |
| Brenda George | Children's Alliance of Montana |
| Caitlin Bentley | Ohio Network of Children's Advocacy Centers |
| Caitlin Massey | Strafford County Child Advocacy Center |
| Cameo Stanick | Hathaway-Sycamores Child and Family Services of Los Angeles |
| Carole Swieckie | Dee Norton Child Advocacy Center |
| Carrie Little | Children's Advocacy Centers of Oklahoma |
| Cathy Brittis | CAC at Children's Hospital at Dartmouth |
| Channing Petrak, MD | Pediatric Resource Center |
| Char Rivette | Chicago Children's Advocacy Center |
| Charles Wilson | Consultant |
| Chelsea Churchill | Children's Advocacy Centers of Texas |
| Chris Kirchner | Children's Advocacy Centers of Pennsylvania |
| Chris Newlin | National Children's Advocacy Center |
| Claudnyse Holloman | Voices for Children Advocacy Center |
| Corey Brodsky | Midwest Regional Children's Advocacy Center |
| Crimson Barocca | Baltimore Child Abuse Center |
| Dana Sawyer | Western Regional Chidlren's Advocacy Center |
| Darby Geller | SAFE Center |
| David Finkelhor, Ph. D. | Crimes against Children Research Center, University of New Hampshire |
| Deana Joy | Children's Advocacy Centers of North Carolina |

| Name | Employer |
| --- | --- |
| Debra Poole, Ph. D. | Central Michigan Univeristy |
| Diana Schunn | Child Advocacy Center of Sedgwick County |
| Dominic Prophete, JD | Wynona's House Child Advocacy Center |
| Dr. Trinity Ingram-Jones | The Cottage |
| Eileen Caraker | Gloucester County Children's Advocacy Center |
| Elizabeth LeTourneau, Ph. D. | Johns Hopkins University |
| Ellen Morrissey | Children's Advocacy Centers of Texas |
| Ernestine Briggs-King, Ph. D. | Duke University |
| Gene Klein | Project Harmony |
| Greg Flett | Southern Regional Children's Advocacy Center |
| Isha Metzger, Ph. D. | University of Georgia, The EMPOWER Lab |
| Jane Braun | NCA Site Reviewer |
| Janet Fine | NCA Site Reviewer |
| Jasmine Mau-Mukai | Hawaii State Chapter of Children's Justice Centers |
| Jeffrey Wherry, Ph. D. | UT Health Science Center at Tyler |
| Jessica Miller | The Gingerbread House |
| Johanna Hager | Braveheart Children's Advocacy Center |
| John Pizzuro | Commander New Jersey State Police |
| Jordan Benning | Midwest Regional Children's Advocacy Center |
| Joyce Moran | Southern Virginia Child Advocacy Center |
| Julie Porterfield | Emerald Coast Children's Advocacy Center |
| Julie Stauffer | CornerHouse |
| Karen Farst, MD | University of Arkansas for Medical Sciences |
| Karen Hangartner | Southern Regional Children's Advocacy Center |
| Karla Tye | Children's Advocacy Centers of Mississippi |
| Kasey Jackson | Children's Advocacy Centers of Texas |
| Kathryn Flack | West Virginia Child Advocacy Network |
| Katie Connell | Federal Bureau of Investigations |
| Kelly DaCunha | Baltimore Child Abuse Center |
| Kelly Kinnish | Georgia Center for Child Avocacy |
| Kimberly Mangiaracino | Children's Advocacy Centers Of Illinois |
| Kori Stephens | Resonance Rising |
| Kristy Brodeur Dermody | CALICO Center, Children's Advocacy Centers of California |

| Name | Employer |
|---|---|
| Laura Gapske | First Witness Child Advocacy Center |
| Laura Ng | Chicago Children's Advocacy Center |
| Leigh Bolin | Resource Center for Parents & Children |
| Libby Nicholson | CARE House |
| Libby Ralston | Dee Norton Child Advocacy Center |
| Linda Cordisco Steele | National Children's Advocacy Center |
| Lindsay Jordan | Children's Advocacy Centers of Texas |
| Lisa Conradi | The Chadwick Center at Rady Children's Hospital |
| Lori Frasier, MD | PinnacleHealth Children's Resource Center |
| Luis Acuna-Pilgrim | Children's Advocacy Centers of Texas |
| Marcia Milliken | Minnesota Children's Alliance |
| Mark Hudson, MD | Midwest Regional Children's Advocacy Center |
| Maureen Fitzgerald | Children's Advocacy Centers of Washington |
| Maureen O'Connell | Midwest Regional Children's Advocacy Center |
| Melissa Brunner | Southern Regional Children's Advocacy Center |
| Melissa Ewer | New Mexico Children's Alliance |
| Melissa Snow | National Center for Missing & Exploited Children |
| Michele Mullen | Northeast Regional Children's Advocacy Centers |
| Michelle Thames | SafeSpot Children's Advocacy Center |
| Nydia Monagas, Psy. D. | New Jersey Children's Alliance |
| Pam Karalunas | NCA Site Reviewer |
| Patti Terzian | Western Regional Children's Advocacy Center |
| Paul DiLorenzo | Philadelphia Children's Alliance |
| Paula Condol | Dakota Children's Advocacy Center |
| Peter Boser | New Jersey Children's Alliance |
| Rachel Niemiec | Massachusetts SANE Program/Norfolk Advocates for Children |
| Regan Stewart, Ph. D. | Medical University of South Carolina |
| Rita Farrell | Zero Abuse Project |
| Ruby Nelson | Prince Georges County Department of Social Services Child Advocacy Center |
| Sabina Alic | Nebraska Alliance of Children's Advocacy Centers |
| Salli Kerr | Western Regional Chidlren's Advocacy Center |
| Sara Lee | Midwest Regional Children's Advocacy Center |

| Name | Employer |
|------|----------|
| Sarah Forrest | Nebraska Alliance of Children's Advocacy Centers |
| Shawna Pagano | Pat's Place Child Advocacy Center |
| Stacie LeBlanc, JD | The Up Institute - APSAC |
| Sue Ascione | Northeast Regional Children's Advocacy Center |
| Susan Goldfarb | Children's Advocacy Center of Suffolk County |
| Suzanne Starling, MD | The Chadwick Center at Rady Children's Hospital |
| Tammi Pitzen | Children's Advocacy Center of Jackson County |
| Ted Cross, Ph. D. | The Children & Family Research Center, University of Illinois |
| Teresa Smith, Ph. D. | Northeast Regional Children's Advocacy Centers |
| Terri Covington | Consultant |
| Tifanie Petro | Children's Home Child Advocacy Center |
| Tina Morgan | NCA Site Reviewer |
| Tom Knapp | South Carolina Network of Children's Advocacy Centers |
| Tomiko D. Mackey | Family Crisis Services of Northwest Mississippi |
| Tony DeVincenzo | Northeast Regional Children's Advocacy Center |
| Tracey Tabet | Utah Children's Justice Centers |
| Vickie Melvin | Philadelphia Children's Alliance |
| Vicky Gwiasda | Western Regional Chidlren's Advocacy Center |
| Victor Vieth, JD | Zero Abuse Project |
| Wendy Lane, MD | Baltimore Child Abuse Center; Howard County Child Advocacy Center |
| Wendy Loomis | Child First Advocacy Center |
| Teresa Huizar | National Children's Alliance |
| Kim Day | National Children's Alliance |
| Kristie McKenney | National Children's Alliance |
| Alyson MacKenzie | National Children's Alliance |
| Alyssa Todd | National Children's Alliance |
| Blake Warenik | National Children's Alliance |
| Michelle Miller, Ph. D. | National Children's Alliance |
| Jan Lutz | Indiana Chapter of National Children's Alliance |





Standard 01

# Multidisciplinary Team

A multidisciplinary team response to child abuse allegations includes representation from the following:

- Law enforcement
- Child protective services
- Prosecution
- Medical
- Mental Health
- Victim Advocacy
- Children's Advocacy Center



# 01. **Multidisciplinary Team**

## Rationale

A committed and effective multidisciplinary team (MDT) with a shared common goal is the foundation of a Children's Advocacy Center (CAC). An MDT is a group of professionals from specific and distinct disciplines that collaborates from the point of report and throughout a child and family's involvement with the CAC. MDTs coordinate investigations and service delivery to mitigate potential trauma to children and families, to keep open the lines of communication and maintain transparency and foster trust, and to help optimize a quality response overall, while preserving and respecting the rights of the clients, and the mandates and obligations of each agency.

A CAC is an agency or organization that facilitates the interagency coordinated response. All MDT representatives contribute their knowledge, experience and expertise for a coordinated, comprehensive, compassionate response that is relevant and accessible to its clients. Quality assurance and a review of the effectiveness of the MDT's collaborative efforts are also critical aspects of the MDT response.

The core MDT must be composed of representatives from law enforcement, child protective services, prosecution, medical providers, mental health providers, victim advocates, MDT leadership, and CAC staff. CAC staff may provide any of the above functions, or additional functions, such as forensic interviewers. Some CACs, including those in small or otherwise under-resourced rural communities, may employ one person to fill multiple roles. For example, the CAC director may also serve as the victim advocate, or a CPS worker may function as a forensic interviewer and a caseworker. What is important is that clear boundaries are maintained between each function, and that the MDT response is inclusive of and utilizes all of the required functions outlined in these Standards.

MDTs may be expanded to include professionals with other relevant roles and responsibilities, including guardians ad litem, adult and juvenile probation officers, dependency (civil) attorneys, out-of-home care licensing personnel, federal investigators, school personnel, domestic violence providers and others as deemed necessary and appropriate for an individual child, family or community on a case-by-case or routine basis.

Generally, a coordinated MDT approach results in efficient interagency communication and information sharing, ongoing collaboration of key individuals, and a network of support for children and families. Each agency benefits from the knowledge and expertise of MDT colleagues, thorough and shared information, and improved and timely gathering of evidence that guide individual and collective interventions and help ensure the most efficacious outcomes for the clients and all of the MDT partners. CACs function within a trauma-informed framework designed to reduce harm and support healing. MDT interventions in a neutral, child-focused CAC setting are associated with clients experiencing less anxiety, having to undergo fewer interviews, and seeing more appropriate and timely referrals for needed services and meaningful participation by clients in the protective services, criminal justice, and other systems where applicable. In addition, a coordinated MDT response can empower parents and other caregivers to protect and support their children throughout the life of the case and beyond.

Case 4:22-cv-00017-SLG    Document 79-5    Filed 01/31/24    Page 14 of 78

EXHIBIT E
Page 14 of 78

# BENEFITS OF THE MDT APPROACH BY MDT FUNCTION

## Law Enforcement

- May generate additional evidence to create a stronger case that is less reliant on only the victim's disclosure.

- Support and advocacy functions are attended to by other MDT partners, leaving law enforcement personnel more time to focus on their investigatory role.

- Enhanced collaboration between investigative partners results in a better understanding of family dynamics and improved response to child protection issues.

## CPS

- Contributes historical family information, which enhances MDT's abilities to foster child safety and provide parental support and assistance with service plans, minimizing need for escalated CPS interventions.

- Provides additional support and intervention in cases where safety cannot be assured.

## Medical Providers

- History and other information obtained during the coordinated forensic interview prevents unnecessary duplication of effort and guides medical decisions.

- Provide consultation on specialized medical evaluations and interpretation of medical findings and reports.

## Mental Health Providers

- Contribute valuable information to the MDT regarding the child's emotional state, treatment, and other service needs, and are able to participate in the criminal justice process and other systems where necessary.

- Help ensure that trauma-informed and culturally relevant assessment, treatment, and related services are routinely made available and accessible to children and families.

## Victim Advocates

- Provide crisis assessment and intervention, safety planning, referrals for additional services, ongoing support, information and case updates, and court advocacy where necessary in a timely manner.

- Help ensure the MDT's ability to anticipate and respond effectively to the specific needs of children and their families; lessen the stress of, and afford legal rights and meaningful participation in, various systems and the court process; and increase access to services and resources for the child and family, including crime victims' compensation.

## Prosecutors

- Provide information about the criminal justice process, victim rights, and seek input from children and families to inform decisions.

- Integrate input from MDT members to optimize ability to hold offenders accountable and ensure community safety.

## Children's Advocacy Center

- Coordinates the MDT response to ensure the child and family are receiving non-duplicative services.

- Offers a child-focused setting where trained professionals conduct forensic interviews and other needed services are provided.

# Essential Component A:

The MDT Coordinator/Facilitator coordinates and facilitates the day-to-day information sharing and activities of the MDT. The MDT facilitator/coordinator must complete training that includes a minimum of eight hours of instruction. **(This may be the same or different from the person who facilitates case review sessions, as some case reviews are facilitated by MDT members.)**

Training topics which cover the function of the MDT Coordinator/Facilitator may include:

- Developing and maintaining relationships with and among MDT members

- Defining roles and responsibilities of team members

- Defining mission, vision, and values of the MDT

- Managing change and turnover on the MDT

- Navigating and resolving conflict

- Knowledge of evidence-informed team development models

- Facilitating shared decision-making

- Ensuring adherence to MDT agreements and protocols

- Understanding of the various meeting structures that support effective teams

- Facilitating effective communication processes

- Creating psychological safety

- Training in implicit bias and how it impacts the MDT

- Building resilience for the MDT

**STATEMENT OF INTENT**

The person designated to coordinate and facilitate the MDT should have training experience in team facilitation to ensure a fully inclusive and participatory process that will ultimately benefit the child client MDT coordinators/facilitators may come from a variety of professional backgrounds. Often they have subject matter expertise in child abuse, child abuse investigations, or other human services occupations. However, facilitating a team of multidisciplinary professionals is a unique skill set. It requires an understanding of group dynamics, conflict resolution techniques, and team problem-solving. This requires specialized training in order to set the MDT Facilitator/Coordinator up for success. The MDT Facilitator/Coordinator may be a person employed by the CAC who has another role in addition (such as an Executive Director, forensic interviewer, or victim advocate) or may exclusively act as the MDT Coordinator/Facilitator. In some CACs this person also facilitates case review. In others, an MDT member may facilitate case review while the MDT Coordinator/Facilitator is responsible for coordinating day to day information-sharing. However, it is constructed the CAC must be able to identify this role, who fills it, and the role must be viewed by the team as the go-to by MDT members for case coordination, information-sharing among team members, and addressing team functioning. The CAC employee who fills this role must have the required baseline training. In the rare instance in which someone outside the CAC plays this vital role, the training requirement does not apply (though is highly encouraged).

# Essential Component B

The designated MDT facilitator must demonstrate participation in continued education in the field of child maltreatment and/or facilitation for a minimum of eight contact hours every two years.

**STATEMENT OF INTENT**

The CAC must provide ongoing opportunities for the MDT facilitator/coordinator employed by the CAC to receive ongoing training. It is important that team facilitators remain current

on developments in facilitation and other relevant fields of practice to further enhance their expertise.

## Essential Component C

The CAC/MDT has, and facilitates, a written interagency agreement signed by authorized representatives of all MDT members that clearly commits the signed parties to its collaborative multidisciplinary response to reports of child abuse and the needs of children and families it serves. The interagency agreement must include:

1. Law enforcement
2. Child protective services
3. Prosecution
4. Mental health
5. Medical
6. Victim advocacy
7. Children's Advocacy Center

**STATEMENT OF INTENT:**

Written agreements formalize commitment to the overall CAC mission and goals, interagency cooperation and collaboration, and adherence to CAC/MDT policies ensuring consistent, high quality, trauma-informed and culturally relevant practice. Whether written agreements are referred to as memoranda of understanding (MOUs) or interagency agreements (IAs) or something else, they must be signed by the leadership of participating agencies (e.g., police chiefs, prosecuting attorney, agency directors or department heads, supervisors, etc.) or their authorized designees. These documents should be developed with input from the MDT, reviewed annually, and revised and re-executed when necessary to reflect changes in leadership/signatories, practice, or policy.

## Essential Component D

Written protocols and/or guidelines address the functions of the MDT, the roles and responsibilities of each discipline/role and their interaction with the CAC throughout the life of the case, including the role of the MDT facilitator/coordinator. Protocols are developed with input from the MDT, updated and signed by all MDT partner agencies minimally every three years. The protocols should be reviewed annually and updated as needed to reflect current practice between three-year signing cycles.

**STATEMENT OF INTENT:**

The active involvement and commitment of all of the MDT agency leaders and their representatives are critical to ensuring that the policies and protocols by which investigations are conducted and services provided are consistently followed.

## Essential Component E

All core members of the MDT, including appropriate CAC staff, are routinely and actively involved in investigations, case management and/or MDT interventions throughout the life of the case, in accordance with the defined needs of children and families and the case.

**STATEMENT OF INTENT:**

The purpose of multidisciplinary involvement for all interventions is to assure the unique needs of children and families are assessed and addressed. Coordination and collaboration among MDT members allow for informed decision-making to occur at all stages of the case to ensure optimal benefit to children and families. Multidisciplinary intervention begins at initial report and includes, but is not limited to, child protection and/or law enforcement response, forensic interviews, pre- and post-forensic interview meetings, consultations, advocacy, medical and mental health

screening, assessment and treatment, referrals for other services, case review and possible prosecution.

# Essential Component F

CAC/MDT members participate in effective information sharing that is consistent with legal, ethical, and professional standards of practice and ensures the timely exchange of case information within the MDT.

**STATEMENT OF INTENT:**

Regular and effective communication and information sharing minimizes duplicative efforts, enhances decision-making, and maximizes the opportunity for children and families to receive the services they need. Understanding of issues of confidentiality and privacy and relevant legal and ethical obligations must be considered and respected.

# Essential Component G

The CAC has written documentation describing how information sharing is communicated among MDT members and how confidential information is protected.

**STATEMENT OF INTENT:**

Most professions represented on the MDT have legal, ethical, and professional standards of practice with regard to client privacy, confidentiality and privileged communications. The standards and requirements may differ across disciplines. States may have relevant laws in addition to the federal Health Information Portability and Accountability Act (HIPAA) that govern such practices. The CAC/MDT must create written confidentiality and information-sharing guidance that align to these standards and specifically apply to the MDT members, staff, and volunteers.

# Essential Component H

The CAC provides routine opportunities for MDT members to give feedback and suggestions regarding procedures and operations of the CAC/MDT. The CAC has a formal process for reviewing and assessing the information provided.

**STATEMENT OF INTENT:**

CACs should have both formal and informal mechanisms for eliciting regular feedback from MDT members regarding the operations and administration of the CAC (e.g., transportation for clients, use of the facility, equipment upgrades, etc.) and MDT issues (e.g., communication, case decision-making, documentation and record-keeping, conflict resolution, training, etc.).

CACs should foster opportunities for open communication in order to create an atmosphere of trust and respect and to enable MDT members to share responsibility for enhancing the quality of the MDT response with their ideas and concerns. Various methods for eliciting feedback and/or suggestions from MDT members may be utilized, including the Outcome Measurement Survey (OMS) tool team satisfaction survey, suggestion boxes and MDT meetings specifically scheduled for this purpose, among others.

# Essential Component I

The CAC/MDT annually provides and/or facilitates relevant training or other educational opportunities focused on issues relevant to investigation, prosecution, and service provision to children and their nonoffending caregivers. The CAC demonstrates documented MDT member participation in this annual professional development.

**STATEMENT OF INTENT:**

Ongoing learning is critical to the successful operation of CAC/MDTs. The CAC identifies and/or provides relevant educational opportunities for MDT members, including topics that enhance the knowledge and skills of MDT members, collaborative work across disciplines and a deeper understanding of each discipline's role in service provision. This may include directly providing training to MDT members, sharing opportunities to attend conferences, and/or online training opportunities offered by the State Chapter, Regional CACs, or state or national training providers.

## Essential Component J

The CAC/MDT provides formal orientation for new MDT members regarding CAC/MDT process, policies and procedures, and code of conduct.

**STATEMENT OF INTENT:**

New MDT members arrive experienced in their profession but often inexperienced with multidisciplinary team principles and practice. Providing an orientation for new MDT members ensures that they understand how the team functions, what is expected of their role, and how each member of the team contributes to the case and to better child outcomes. Orienting team members well at the beginning can reduce confusion and conflict and contribute to better overall team function.





Standard 02

# Diversity, Equity, and Access

The Children's Advocacy Center provides culturally responsive services for all CAC clients throughout the duration of the case.



# 02. Diversity, Equity, and Access

## Rationale

Cultural responsiveness is the ability to understand and consider different cultural backgrounds of the clients to whom you offer services. It also demonstrates the capacity to learn from and relate respectfully with people from both similar and different cultural backgrounds, requiring the ability to appreciate, understand and interact with members of diverse populations within the local community. Cultural responsiveness is a fundamental component of the CAC philosophy and is as central to operations as developmentally appropriate, child-focused, and trauma-informed practice. Like developmental considerations, cultural norms influence nearly every aspect of working with children and families, such as welcoming a child and family to the child advocacy center, employing effective forensic interviewing techniques, assessing the likelihood of abuse, selecting appropriate mental health providers, and securing services that are relevant and accessible to a child and family. To effectively meet clients' needs, the CAC and MDT must be willing and able to understand the clients' worldviews, adapt practices as needed, and offer assistance in a manner in which it can be utilized. Striving toward culturally responsive services is an important and ongoing endeavor and an integral part of a CAC's operations and service delivery.

Proactive, culturally relevant planning and outreach should focus on culture, experience of acculturation, ethnicity, religion, socioeconomic status, disability, gender, gender identity and expression, and sexual orientation. These factors contribute to a client's lived experiences and perspectives, and they must be considered and accommodated throughout the investigation, intervention, and case management processes. Addressing these factors in a culturally sensitive environment helps children and families of all backgrounds and experiences feel welcomed, valued, and respected by staff, MDT members and volunteers.

The CAC and its partners develop policies, procedures and practices that are designed to reduce disparities in access to services and outcomes from services provided. The CAC and MDT actively express values and understanding of equity and inclusion and those values are evident in practice.

## Essential Component A

The CAC in, partnership with the MDT, conducts a community assessment at a minimum of every three years, which includes:

1. Community demographics

2. CAC client demographics

3. Analysis of disparities between these populations

4. Methods the CAC utilizes to identify and address gaps, disparities and/or inequities in services

5. Strategies for outreach to unserved or underserved communities, in alignment with identified disparities

6. A method to monitor the effectiveness of outreach and intervention strategies

**STATEMENT OF INTENT:**

In order to serve a community in a culturally responsive manner, a CAC, in partnership

with its MDT, must complete a comprehensive assessment of the entire community and jurisdiction they serve. The assessment should focus on a range of issues, including, but not limited to, race, ethnicity, gender, gender identity and expression, sexual orientation, disabilities, income, geography, religion, and culture. The assessment should inform the development of goals and strategies that ensure the CAC delivers high-quality, relevant, and accessible services to all children and families in need.

# Essential Component B

The CAC must ensure that provisions are made for non-English-speaking and deaf and hard-of-hearing children and their family members throughout the investigation, intervention, and case management processes.

**STATEMENT OF INTENT:**

The ability to effectively communicate is critical in creating an environment in which children and families feel comfortable and safe and are respected and supported. Language barriers may hinder the ability for children and families to understand the CAC and MDT process/roles, and to communicate their concerns and decisions regarding the investigation and intervention services. Language barriers may also compound children and families' feelings of fear, anxiety, and confusion. Language can significantly impact the CAC and/or MDT's abilities to both share with, and obtain accurate information from, the child and family. The CAC must explore a variety of resources or solutions to ensure adequate provisions are made to overcome language and communication barriers. In order to protect the integrity of the investigation and services, care should be taken to ensure appropriate interpreters are utilized. CACs must not utilize children or client family members to interpret for MDT members.

# Essential Component C

CAC services are accessible and tailored to meet the various individualized and unique needs of children and families throughout the investigation, intervention, and case management process.

**STATEMENT OF INTENT:**

It is the responsibility of the CAC and MDT members to understand and tailor services to the diverse backgrounds and unique needs of the children and families being served. Ascertaining the client's background from the client allows CAC/MDT members to better understand child and family perceptions of past and present abuse and trauma, attributions of responsibility, and experience of acculturation and comprehension of laws. In addition, it allows the CAC/MDT to address any religious or cultural beliefs that may affect disclosure, needed services and access to them, and to recognize the impact of prior experience with police and government authorities both in this country and in their countries of origin. Furthermore, the CAC's investigation and case management services must be accessible and responsive to children with physical disabilities, cognitive delays, and medical and mental health disorders. With knowledge, preparation and necessary skills, the MDT can obtain as complete and accurate information as possible and more effectively understand and respond to the child and family's needs.

# Essential Component D

The CAC demonstrates ongoing efforts through formal policies, procedures and practices to recruit, hire, and retain staff, volunteers, and board members who reflect the demographics of the community.

**STATEMENT OF INTENT:**

Actively seeking to recruit, hire, and retain staff, volunteers, and board members who reflect the demographics of the community

and the clientele served is critical to achieving an overall response to children and families that is inclusive, relevant, and effective.

## Essential Component E

The CAC values Diversity, Equity, and Inclusion (DEI) and requires CAC staff to participate in DEI training a minimum of eight hours every two years.

Examples of training topics could include:

- Implicit bias
- Microaggressions
- Organizational learning
- Building a culture of inclusion
- Reducing disparities in services

**STATEMENT OF INTENT:**

Understanding and integrating issues of diversity, equity and inclusion are not accomplished in a single training. Valuing DEI in all CAC activities requires an intentional, ongoing, and evolving exploration of its personal and professional meaning and implications for how staff interact with, and provide services and support to, clients and communities with diverse backgrounds and needs. Participating in this minimum number of hours of training every two years demonstrates a baseline commitment to ensuring that these critical issues become part of the CAC staff's individual and collective responses to the children, families, and communities they serve.

## Essential Component F

The CAC values Diversity, Equity, and Inclusion (DEI) and annually provides MDT members access to DEI training and information. The CAC documents training opportunities (whether provided directly or through access to other organizations) and MDT participation.

Examples of training topics could include:

- Implicit bias
- Microaggressions
- Organizational learning
- Building a culture of inclusion

**STATEMENT OF INTENT:**

Understanding and integrating issues of diversity, equity and inclusion into professional practice are not accomplished in a single training. Valuing DEI in all activities of MDT members, both individually and collectively, requires an intentional, ongoing, and evolving exploration of the personal and professional meaning of DEI and how it impacts the accessibility of services and support to their clients. Participating as a team in DEI training helps demonstrate a baseline commitment to these critical issues that enhance the individual and collective responses to the children, families, and communities that all MDT members serve. Quality DEI training and resources are offered through many organizations. Many available online trainings and other resources are available free of charge. A good place to start is to ask your State Chapter and/or Regional Children's Advocacy Center about available resources.



Standard 03

# Forensic Interview

Forensic interviews are coordinated to avoid duplicative interviewing and are conducted in a manner that is legally sound and of a neutral, fact-finding nature.



Case 4:22-cv-00017-SLG    Document 79-5    Filed 01/31/24    Page 25 of 78
EXHIBIT E
Page 25 of 78

# 03. Forensic Interview

3. Forensic Interview

## Rationale:

The purpose of CAC forensic interviews is to facilitate information gathering from children to determine whether abuse occurred and, if so, the nature of the allegations. This information is intended to contribute to accurate and fair decision-making by the MDT members relative to the criminal justice, child protection and relevant service delivery systems. Forensic interviews are conducted in a manner that is developmentally and culturally responsive, unbiased, fact-finding and legally sound. When a child is unable to provide information regarding any concern of abuse through the forensic interview process, other interventions to assess the child's safety and well-being are required.

The CAC/MDT must adhere to research-based forensic interview guidelines that create an interview environment that enables free recall, minimizes interviewer influence, and gathers information needed by all the MDT members in order to avoid duplication of the interview process. The CAC/MDT must monitor these guidelines over time to ensure they reflect current research-based practice, and CAC/MDT protocols and practices need to be congruent.

Forensic interviews are the foundation for multiple CAC/MDT functions, including child protection and criminal investigations, prosecution, and implementation of services critical to helping ensure children and families' paths toward safety, healing, and justice. The child's experience during the initial forensic interview may significantly impact the child's understanding of, and ability to respond to, the ensuing steps in the various aspects of the intervention process.

Skilled forensic interviewing by appropriately trained individuals requires an appropriate neutral setting and effective communication among MDT members. While CACs vary with regard to who conducts forensic interviews, the role must be fulfilled by an appropriately trained, qualified, supervised professional who engages in peer review and ongoing professional development. This may include a CAC-employed forensic interviewer, law enforcement officers (local, state, and/or federal), CPS workers, or others determined by the CAC/MDT in accordance with the resources available in their respective communities. At a minimum, any professional in the role of a forensic interviewer must have initial and ongoing formal forensic interviewer training that is approved by National Children's Alliance (NCA) for purposes of accreditation. State laws may also dictate which professionals can or should conduct forensic interviews.

The CAC/MDT's written documents must include the general interview protocol, guidelines for selecting an appropriately trained interviewer, specifications for sharing of interview information among MDT members, and a mechanism for collaborative case planning, peer review and continuing education. Additionally, for CACs that conduct Extended Forensic Evaluations, an additional protocol for this purpose must also be articulated.

## Essential Component A

Forensic interviews are provided by MDT/CAC staff with specialized training in conducting forensic interviews.

The CAC must demonstrate that all forensic interviewer(s) have successfully completed

training that includes the following elements:

1. Minimum of 32 hours of instruction and practice

2. Evidence-supported interview protocol

3. Pre- and post-testing that reflects understanding of the principles of legally sound interviewing

4. Child development; question design; implementation of protocol; dynamics of abuse; disclosure process; diversity, equity, and inclusion; and suggestibility

5. Practice opportunities with a standardized evaluation process

6. Required reading of current articles specific to the practice of forensic interviewing

Curriculum must be included on NCA's approved list of nationally or state-recognized forensic interview trainings or submitted with the accreditation application for review and approval.

**STATEMENT OF INTENT:**

The CAC/MDT must have a process to ensure initial forensic interview training for anyone conducting a forensic interview at the CAC. While MDT members may have received general interview training, conducting forensic interviews of children in the context of an MDT response requires specialized training and qualifications.

# Essential Component B

Individuals who conduct forensic interviews must demonstrate participation in ongoing education in the field of child maltreatment and/or forensic interviewing for a minimum of eight contact hours every two years.

**STATEMENT OF INTENT:**

The CAC/MDT must provide ongoing opportunities for professionals who conduct forensic interviews to receive specialized

training. It is vitally important that forensic interviewers remain current on developments in forensic interviewing and other relevant fields of practice to further enhance their expertise.

# Essential Component C

CAC/MDT forensic interview protocols must reflect the following items:

1. Case acceptance criteria

2. Criteria for choosing an appropriately trained interviewer (for a specific case)

3. Personnel expected to attend/observe the interview on-site, specifically including those with investigative responsibilities for the case

4. Information sharing and communication between the MDT and the forensic interviewer before and after the interview

5. Use of interview aids

6. Use of interpreters

7. Recording and/or documentation of the interview

8. Interview methodology (i.e., state- or nationally recognized forensic interview training models)

9. Introduction of evidence in the forensic interviewing process

10. Sharing of information among MDT members

11. A mechanism for collaborative case coordination

12. Criteria and process for conducting a multi-session or subsequent interview

13. The use of technology for remote live observation of the forensic interview using a secure method (if applicable)

14. The criteria and process for the use of tele-forensic interviews (if applicable)

## STATEMENT OF INTENT:

The forensic interview process must be described in comprehensive detail in the agency's written guidelines or agreements. These guidelines help ensure consistency and quality of interviews, inform MDT discussions pre-and post-interview, and support subsequent decision-making. Technology now makes it possible to both conduct and observe (in real time) forensic interviews online and remotely. Centers that wish to do either or both should clearly identify in the written guidelines or agreements the circumstances in which this is allowed and the process for doing so. Children who receive a tele-forensic interview must be afforded the full range of CAC services and MDT interventions as with any other clients. Care must be taken that the use of remote live observation does not result in the need for repeated interviews or miscommunication between team members. And any use of remote live observation requires the team's written guidelines and agreements to outline who may do so, and under what circumstances.

# Essential Component D

The CAC allows for real-time observation of forensic interviews by MDT members.

## STATEMENT OF INTENT:

In order to create a psychologically safe space and lessen or eliminate the need for duplicative interviews, interviewers should be observed by MDT members in a space other than the interview room. The MDT should also have the ability to communicate with the interviewer in some manner to provide input and feedback during the real-time interview with the child to reduce the need for additional interviews.

# Essential Component E

MDT members with investigative responsibilities on a case must participate in live/real-time observation of forensic interviews to ensure necessary preparation, information sharing and MDT/interviewer coordination throughout the interview and post-interview process.

## STATEMENT OF INTENT:

MDT members, as defined by the needs of the case, are present to observe the forensic interview and participate in pre- and post-interview discussions. This practice provides MDT members with access to the information necessary to fulfill their respective investigatory and related professional roles. MDT members who are present for forensic interviews typically include local, state, federal or tribal child protective services, and law enforcement; others may vary based on the circumstances of each case.

# Essential Component F

Cases meeting the CAC case acceptance criteria, as outlined in the MDT protocol, have forensic interviews conducted at the CAC, or through a secure tele-forensic method, a minimum of 75% of the time.

## STATEMENT OF INTENT:

Forensic interviews of children, as defined in the CAC/MDT's written protocols, will be conducted at the CAC, where the MDT is best equipped to meet the child's needs during the interview.

Written protocols must also address the rare occasions when interviews may need to take place outside the CAC with the agreed-upon forensic interview guidelines utilized. Some CACs have established interview rooms outside of the primary CAC, such as at a satellite office. In an alternate setting, MDT members must assure the child's comfort, privacy and protection from alleged offenders and others who may unduly influence the child. Remote or tele-forensic interviews may also occur when appropriate and/or necessary to increase access and utilization of CAC forensic interviews. All such alternatives must be agreed upon by the MDT and codified in the written protocols. And

any alternative must continue to afford child clients the full range of CAC services.

CACs are encouraged to develop policies that will provide the most comprehensive services and benefits to all children in their communities. Case acceptance criteria may include various types of abuse, other forms of direct or indirect exposure to violence/trauma, jurisdictional issues, and the ages of children, among others.

# Essential Component G

Individuals who conduct forensic interviews must participate in a structured forensic interviewer peer review process a minimum of two times per year. Peer review serves as a quality assurance mechanism that reinforces the methodologies utilized and provides support and problem solving for participants. Structured peer review includes:

1. Ongoing opportunities to network with, and share learning and challenges with, peers

2. Review and performance feedback on actual interviews in a professional and confidential setting

3. Discussion of current relevant research articles and materials and implications for forensic interview practice

4. Training opportunities specific to forensic interviewing of children and CAC-specific methodologies.

STATEMENT OF INTENT:

Participation in peer review is vital for quality assurance of forensic interviewers and allows for the further development and enhancement of their skills based on new research and developments in the field. Peer review is a complement, not a substitute, for supervision, as well as multidisciplinary case review and case planning.

# Essential Component H

The CAC/MDT coordinates information gathering, including history taking, assessments and forensic interview(s) to avoid duplication.

STATEMENT OF INTENT:

All members of the MDT need information to complete their respective assessments and evaluations. Whether it is initial information gathered prior to the forensic interview, history taken by the medical provider, or intake by the mental health or victim services provider, every effort should be made to avoid unnecessary duplication of information gathering from the child and family members and ensure effective information sharing among MDT members.

03. Forensic Interview





Case 4:22-cv-00017-SLG    Document 79-5    Filed 01/31/24    Page 30 of 78
EXHIBIT E
Page 30 of 78

Standard 04

# Victim Support and Advocacy

Victim support and advocacy services are provided to all CAC clients and their caregivers as part of the multidisciplinary team response.



# 04. Victim Support and Advocacy

## Rationale:

Research demonstrates that parent/caregiver support is essential to reducing trauma and improving outcomes for children and family members. Client access to, and participation in, investigation, prosecution, treatment, and support services are core components of MDT response, and are informed and supported by coordinated victim advocacy services. Up-to-date information and ongoing access to comprehensive services are critical to a child and family's well-being and ability to participate in an ongoing investigation, possible prosecution, intervention, and treatment.

Victim support and advocacy responsibilities are implemented consistent with legal and, where relevant, state constitutional victims' rights and the complement of services in the CAC's coverage area. Many members of the MDT may advocate for children and families within their discipline systems or agencies. However, victim advocacy is a discipline unto itself with a distinct and central role on the MDT. Victim advocates provide services and resources to ensure a consistent and coordinated comprehensive network of support for each child and family.

Children and families in crisis need assistance in navigating the multiple systems involved in the CAC response. More than one victim advocate may perform these functions at different points throughout a case, requiring continuity and consistency in service delivery. Coordination of victim support is the responsibility of the CAC and must be defined in the CAC/MDT's written documents, including understanding of relevant statutes and ethics regarding confidentiality and privilege. Specific victim support services may be provided in a variety of ways, as dictated by the needs of the CAC clients and case, such as:

- Employing staff members with varying job titles to perform advocacy functions (e.g., family advocates, care coordinators, victim advocates and child life specialists, among others)

- Linking with local community-based advocates, including, but not limited to domestic violence advocates, rape crisis counselors, Court Appointed Special Advocates and advocates at culturally specific organizations

- Linking with system-based advocates (e.g., law enforcement victim advocates, prosecutor-based victim witness coordinators)

- Combining victim support services depending upon the individual needs of children and families

All advocates who serve on the MDT and are providing services to CAC clients must meet the prescribed training and supervision requirements. This includes advocates on staff at the CAC and/or advocates from outside organizations providing advocacy services and serving as members of the MDT.

## Essential Component A

Comprehensive, coordinated victim support and advocacy services are provided by designated individual(s) who have specialized training that includes a minimum of 24 hours of instruction, including, but not limited to:

1. Dynamics of child abuse

2. Trauma-informed services

3. Crisis assessment and intervention

4. Risk assessment and safety planning

5. Professional ethics and boundaries

6. Understanding the coordinated multidisciplinary response

7. Understanding, explaining, and affording of victim's legal rights

8. Court education, support, and accompaniment

9. Knowledge of available community and legal resources, referral methods and assistance with access to treatment and other services, including protective orders, housing, public assistance, domestic violence intervention, transportation, financial assistance, and interpreters, among others as determined for individual clients

10. Cultural responsiveness and addressing implicit bias in service delivery

11. Caregiver resilience

12. Domestic violence/family violence/children's exposure to domestic violence and poly-victimization

**STATEMENT OF INTENT**

Victim support and advocacy is fundamental to the MDT response. These professional support/advocacy responsibilities may be filled by a designated victim advocate who is an employee of the CAC or another victim-serving agency. Another MDT member with appropriate experience and training in victim advocacy may also serve in this role; however, in doing so, it must not conflict with the other MDT functions they may have.

## Essential Component B

Individuals who provide victim advocacy services for the CAC must demonstrate participation in ongoing education in the field of victim advocacy and child maltreatment consisting of a minimum of eight contact hours every two years.

**STATEMENT OF INTENT**

The CAC and/or MDT must provide initial and ongoing opportunities for professionals who provide advocacy services to receive specialized training and peer support. As with all other disciplines represented on the MDT and serving CAC clients, it is vitally important that victim advocates remain current on developments in fields relevant to their delivery of services to children and families.

## Essential Component C

Victim advocates serving CAC clients must provide the following constellation of services:

1. Crisis assessment and intervention, risk assessment and safety planning and support for children and family members at all stages of involvement with the CAC

2. Assessment of individual needs, cultural considerations for child/family and help to ensure those needs are being addressed in concert with the MDT and other service providers

3. Presence at the CAC during the forensic interview in order to participate in information sharing with other MDT members, inform and support the family regarding the coordinated, multidisciplinary response, and assess needs of children and nonoffending caregivers

4. Provision of education and assistance in ensuring access to victim's rights and crime victim's compensation

5. Assistance in procuring concrete services (housing, protective orders, domestic violence intervention, food, transportation, public assistance, civil legal services, etc.)

6. Provision of referrals for trauma-focused, evidence-supported mental health and specialized medical treatment, if not provided at the CAC

7. Facilitating access to transportation to interviews, court, treatment, and other case-related meetings

8. Engagement with the child and family to help them understand the investigation/prosecution process and help ensure understanding of crime victims' rights

9. Participation in case review to communicate and discuss the unique needs of the child and family and associated services planning; and help ensure the coordination of identified services and that the child and family's concerns are heard and addressed

10. Provision of case status updates to the family, including investigations, court date, continuances, dispositions, sentencing and inmate status notification (including offender release from custody)

11. Provision of court education and support, including court orientation and accompaniment

### STATEMENT OF INTENT

While the particular combination of services required will vary based upon the child and family's unique needs and the legal requirements of any civil and/or criminal cases, all children and families need support in navigating the various systems they encounter that are often unfamiliar to them. Crisis and risk assessments and intervention, advocacy, and support services will help to identify the child and family's unique needs, reduce fear and anxiety, and expedite access to appropriate services and resources. Families can be assisted with crisis management, including problem solving, access to critical treatment and other services, and ongoing education, information, and support. Crises may recur with various precipitating or triggering events, including, but not limited to, financial hardships, child placement, arrest, change/delay in court proceedings and preparation for court testimony. Children may experience crisis and trauma, including suicidal ideation, at unanticipated times. Many CACs provide advocacy services for children and their family members on-site and/or through linkage agreements with other community agencies or system-based providers.

State and federal laws require that victims of crime, including victims of child abuse, are informed of their rights as crime victims, including information about, and eligibility for, crime victim compensation. Caregivers who are affected by the crime are also entitled to services and may be eligible for victim compensation. Generally, children and their families will be unfamiliar with their legal rights. Therefore, information regarding rights and services should be routinely and repeatedly explained at the outset of their involvement with the CAC/MDT and made available to all children and their caregivers.

## Essential Component D

Active outreach and follow-up support services for caregivers consistently occurs.

### STATEMENT OF INTENT

Often, families have never been involved in this multi-system response, which can prove intimidating and confusing. Active outreach requires follow-up with families beyond initial investigation, assessment, and crisis response. Follow-up services after the initial contact at the CAC must include ongoing, regular contact until the CAC concludes its involvement with the case.

In the aftermath of victimization, the child and family typically feel a significant loss of control. Education provides information that is empowering. Victim education must be ongoing and even repetitive as needed, as families may be unable to process so much information at one time, particularly in the midst of a crisis. The family may be dealing with immediate safety issues and may be coping with the emotional impact of the initial report and ensuing forensic interview and investigation process. They may need a variety of concrete medical, mental health, and social services. As the case dynamics change, and as the case

proceeds through the various systems, the needs of the child and family will also change. It is important that their needs continue to be assessed, so that additional relevant information, support, and services can be offered and so that said services are accessed and relevant.

# Essential Component E

The CAC/MDT's written protocols/guidelines include availability of victim support and advocacy services for all CAC clients throughout the life of the case and participation of victim advocate(s) in the MDT case review. This participation must be in accordance with legal requirements regarding confidentiality.

## STATEMENT OF INTENT

Because victim support/advocacy is a central function of the CAC response, the availability and provision of ongoing victim support and advocacy by designated, trained individuals must be included in the CAC/MDT's written documents. Service coordination, both within and outside the CAC, must be clearly defined, including the role of the victim advocate during the interview process, follow-up, and case review.

# Essential Component F

Coordinated case management must occur with all individuals providing victim advocacy services to CAC clients.

## STATEMENT OF INTENT

If multiple advocacy agencies share the delivery of services, the CAC is responsible for establishing protocols and linkage agreements agreed upon by the MDT that clearly define the victim advocacy roles and ensure seamless coordination of victim advocacy services.

In any community or jurisdiction a CAC serves, there may be various agencies and programs providing advocacy and support services to child and adult victims and survivors who have experienced abuse and trauma. In addition to victim advocates who may be employed by the CAC, there may be advocates on staff in law enforcement agencies, prosecutors' offices, domestic and sexual violence community-based agencies, hospitals, and CASA programs, among others. While specific job titles may vary, children and families engaged with the CAC/MDT may also be receiving services from some or all of these agencies/programs. To better understand each other's roles, optimize cross-referrals for CAC clients, avoid unnecessary duplication and ensure meaningful coordination of services, the CAC must develop a process for achieving these goals in collaboration with one another. This process will need to include understanding and respect for issues of confidentiality and methods for sharing case-specific information accordingly.







Case 4:22-cv-00017-SLG   Document 79-5   Filed 01/31/24   Page 36 of 78

EXHIBIT E
Page 36 of 78

# Medical Evaluation

Specialized medical evaluation and treatment services are available to all CAC clients and are coordinated as part of the multidisciplinary team response.



Case 4:22-cv-00017-SLG     Document 79-5     Filed 01/31/24     Page 37 of 78
EXHIBIT E
Page 37 of 78

# 05. Medical Evaluation

## Rationale

All children who are suspected victims of child sexual abuse are entitled to a medical evaluation by a health care provider with specialized training and expertise. The collection and documentation of forensic findings are vital. However, the referral of children for medical examinations should NOT be limited to those where forensically significant findings are anticipated. Medical evaluations should be prioritized as emergent, urgent, and non-urgent based on specific screening criteria. Said criteria must be developed by specially trained and skilled medical providers, who may be those serving on local multidisciplinary teams. Additional considerations include the ability to conduct follow-up examinations to reassess findings and conduct further testing where deemed necessary.

A medical evaluation holds an important place in the multidisciplinary assessment of child abuse. An accurate and complete history is essential in making medical diagnoses and determining appropriate treatment of child abuse. Recognizing that there are several acceptable models that can be used to obtain a history of the abuse allegations, and that forensic interview techniques are specialized skills that require training, information gathering must be coordinated with the MDT to avoid duplication. Because many children are familiar with the helping role of doctors and nurses, they may disclose information to medical personnel that they might not share with investigators. In fact, some children are able to describe residual physical symptoms to medical providers even when no injury is seen. If a nonmedical member of the MDT is conducting the in-depth forensic interview, further medical history will still likely be needed from the caregiver and/or child to complete

the medical evaluation. As such, information gathering and sharing must be coordinated to avoid duplication and help ensure a comprehensive response (see Med-Appendix 1 for an example of Components of Medical History for Child Sexual Abuse Evaluation).

## Essential Component A

Medical evaluations are conducted by health care providers with specific training in child sexual abuse who meet at least ONE of the following training standards:

1. Child Abuse Pediatrics Subboard eligibility or certification

2. Physicians without board certification or eligibility in the field of child abuse pediatrics, advanced practice nurses, and physician assistants should have a minimum of 16 hours of formal didactic training in the medical evaluation of child sexual abuse (see Med-Appendix 2)

3. Sexual assault nurse examiners (SANEs) without advanced practitioner training should have a minimum of 40 hours of coursework specific to the medical evaluation of child sexual abuse followed by a competency- based clinical preceptorship with an experienced provider in a clinical setting, where the SANE can demonstrate competency in performing exams (see Med-Appendix 2 or IAFN guidelines)

### STATEMENT OF INTENT

Physicians, advanced practice nurses, physician assistants and SANEs without advanced practice training may all engage in medical evaluations of child abuse. Due to differences

in foundational training in pediatric assessment by provider type (see Med-Appendix 2), the above training and eligibility standards must be met by the health care provider of a CAC (regardless of whether the exams are occurring on- or off-site).

All providers should be licensed to practice and be in current good standing by their corresponding state board of practice regulation. Nurses must practice within the scope of their applicable state nurse practice acts. A medical director (physician or advanced practice nurse) is needed for non-advanced practice nurses to assist with the development of practice protocols and the treatment needs of the patient, including referrals for other medical or mental health issues that are discovered during the evaluation. The medical director may or may not also meet qualifications as an "advanced medical consultant" (as defined in the "Continuous Quality Improvement" section) who can perform review of examination findings. If the medical director does not also serve as a medical provider for the CAC, this person should, at a minimum, be familiar with the essential components of the medical standard and the mission of the CAC.

Some CACs have qualified medical providers as full- or part-time staff, while others provide this service through affiliation and linkage agreements with local providers or regional facilities. Whether the exams occur on-site or off-site, or by CAC staff or via a linkage agreement, the medical provider must meet the Training and Eligibility Standards for Training (above) and Continuous Quality Improvement.

Continuous quality improvement (CQI) for the CAC's medical component:

The medical provider must be familiar and up to date with published research studies on findings in abused and non-abused children, sexual transmission of infections in children, and current medical guidelines and recommendations from national professional organizations such as the American Academy of Pediatrics Committee on Child Abuse and Neglect, the American Professional Society on the Abuse of Children, and the Centers for Disease Control and Prevention. Accuracy in interpretation of examination findings is vitally important to the child, family, and the MDT as a whole. The medical provider must provide documentation of participation in CQI activities, including continuing education and expert review of positive findings with an "advanced medical consultant" in order to stay current in the field of child sexual abuse.

## Essential Component B

Medical professionals providing services to CAC clients must demonstrate continuing education in the field of child abuse consisting of a minimum of eight contact hours every two years.

Teaching experience in the area of child abuse that is approved to provide CEU or CME activity also qualifies for ongoing education credit.

## Essential Component C

Medical professionals providing child sexual abuse evaluations to CAC clients must demonstrate that all findings deemed abnormal or "diagnostic" of trauma from sexual abuse have undergone expert review by an "advanced medical consultant."

• Expert review with a child abuse pediatrician is preferred and can occur in multiple ways, including via a direct linkage agreement with a specific provider, through myCasereview sponsored by the Midwest Regional CAC, or through other identified state-based medical expert review systems that have access to an "advanced medical consultant."

• Physicians or advanced practice nurses can also provide said review if they have the following qualifications:

- Meet the minimum training standards outlined for a CAC medical provider

- Have performed at least 100 child sexual abuse exams

- Are current in CQI requirements

The CAC and medical provider must work collaboratively to establish a method to track de-identified case information as part of the CQI process (see Med-Appendix 3).

### STATEMENT OF INTENT

The accuracy and integrity of forensic medical evaluation findings is critically important in child sexual abuse cases. While a small percentage of medical evaluations result in a positive or diagnostic finding for sexual abuse (about 3–5% in the literature), it is critical to both the future safety of the child and the integrity of any criminal justice case that the findings are accurate. Research indicates that the most important in diagnostic accuracy over time is consistent review. Because a false positive ("overcalling") can lead to a miscarriage of justice, given the reliance of MDT members on medical findings in making charging decisions and the reliance on such findings at trial, it is essential to have 100% of all medical findings diagnostic for child sexual abuse reviewed by an advanced medical consultant.

The medical provider must be able to provide documentation of participation in expert review with an "advanced medical consultant" on all abnormal sexual abuse exams for the purpose of CAC case-tracking information that could be requested for review in the accreditation process.

The providers who qualify as "advanced medical consultants" to offer expert review of examination findings are listed above in the essential component, as is the critical importance of collaboratively establishing the required CQI process.

## Essential Component D

Specialized medical evaluations for child clients are available on-site or through linkage agreements with other appropriate institutions, agencies, or providers.

### STATEMENT OF INTENT

Specialized medical evaluations can be provided in a number of ways. Some CACs have a qualified medical provider who comes to the center on a scheduled basis, while in other communities, the child is referred to a medical clinic or health care agency for this service. CACs need not be the primary care provider, but they must have protocols in place outlining and facilitating the linkages to a facility with a qualified medical provider and other needed health care services.

## Essential Component E

Specialized medical evaluations are available and accessible to all CAC clients regardless of ability to pay.

### STATEMENT OF INTENT

In many communities, the cost of a medical evaluation is covered by public funds. In other settings, limited public funding requires that individuals who can pay or are insured cover the cost of their own examinations, or for those clients who require support, MDT members can help facilitate reimbursement through victim compensation. Regardless of the source of funding for the examinations, ability to pay should never be a factor in determining who is offered and able to access a medical evaluation.

## Essential Component F

CAC/MDT written protocols and guidelines include access to appropriate medical evaluation and treatment for all CAC clients.

## STATEMENT OF INTENT

Because medical evaluations are a critical component of the CAC's multidisciplinary response, the CAC's written protocols must detail how its clients access these services. Many CACs provide services to victims of physical abuse and neglect as well as to victims of sexual abuse. All CACs must have written protocols and agreements outlining how medical evaluations for all types of abuse and neglect should occur. CACs that provide medical evaluations for sexual abuse, but not specifically for physical abuse or neglect, must include written procedures for how to access medical evaluations for alleged physical abuse or neglect, including treatment for injuries and management of emergency or life-threatening conditions that may become evident during a sexual assault exam.

# Essential Component G

CAC/MDT written protocols and guidelines include the circumstances under which a medical evaluation for child sexual abuse is recommended, provided, and accessed.

## STATEMENT OF INTENT

The purpose of a medical evaluation in suspected child abuse extends far beyond providing an evidentiary examination for the purpose of the investigation. The primary goals of the medical evaluation are to:

- Help ensure the health, safety, and well-being of the child

- Evaluate, document, diagnose and address medical conditions resulting from abuse

- Differentiate medical findings that are indicative of abuse from those which may be explained by other medical conditions

- Document, diagnose and address medical conditions unrelated to abuse

- Assess the child for any developmental, emotional, or behavioral issues needing further evaluation and treatment and make referrals as necessary

- Educate the child and family regarding all aspects of the medical examination and outcomes

- Provide support relative to any recommended next steps and reassurance regarding child's overall health and well-being

- Make recommendations regarding mental health and other services to address trauma related to the abuse/assault in coordination with other members of the MDT/CAC

CACs differ in their practices for how medical evaluations are made available. The MDT's written protocols or agreement must include qualified medical input to define the referral process and how, when and where examinations are made available. Examinations can be differentiated between those needed emergently (without delay), urgently (scheduled as soon as possible with a qualified provider), or nonurgently (scheduled at the convenience of family and provider but ideally within 1–2 weeks). Some patients may also benefit from a follow-up examination (see Med-Appendix 4). CACs are responsible for ensuring that exams are performed by experienced, qualified medical providers at the appropriate location and time, and that examinations are photo-documented to minimize unnecessary repeat examinations. This often requires initial conversations with emergency departments and primary care providers to develop a process for referral to the specialized medical provider as defined by the needs of the child.

# Essential Component H

Documentation of medical findings is maintained by written record and photo-documentation. Medical records storage must be HIPAA compliant. The medical records storage must be secured, sufficiently backed up and accessible to authorized personnel in accordance with all applicable federal and state laws.

05. Medical Evaluation

## STATEMENT OF INTENT

The medical history and physical examination findings must be carefully, thoroughly, and legibly documented in the medical record. The medical record should also include a statement as to the significance of the findings and treatment plan. Medical records should be maintained in compliance with federal rules governing protection of patient privacy. Medical records may be made available to other medical providers for the purpose of needed treatment of the patient and to those agencies mandated to respond to a report of suspected child abuse. Even in situations where the medical record can legally be provided without separate written consent or court order, a log of disclosures should be maintained with the medical record in accordance with federal privacy rules (see Med-Appendix 5).

Diagnostic-quality photographic documentation of the ano-genital exam findings should be obtained in all cases of suspected sexual abuse using still and/or video documentation. This is particularly important if the examination findings are thought to be abnormal. Photographic documentation allows for review for CQI and for obtaining consultation or second opinion and may also obviate the need for a repeat examination of the child. CACs should have policies in place for storage and release of examination images that protect the sensitive nature of the material. In the uncommon exception that photo-documentation is not possible due to the child's discomfort with the equipment or equipment malfunction, diagram drawings with detailed written description of findings should occur.

Detailed procedures for the documentation and preservation of evidence (labeling, processing, and storing) in written protocols and agreements can help to assure the quality and consistency of medical evaluations. Such protocols can also serve as a checklist and training document for new medical providers. Many states have mandated forms for recording findings of a sexual assault exam and guidelines for the preservation of evidence.

## Essential Component I

MDT Members and CAC staff are trained regarding the purpose and nature of the medical evaluation for suspected sexual abuse. Designated MDT members and/or CAC staff educate children and caregivers regarding the medical evaluation.

### STATEMENT OF INTENT

The medical evaluation for suspected child sexual abuse often raises significant anxiety in children and their caregivers, usually due to misconceptions about how the examination is conducted and what findings, or lack of findings, mean. An appropriately trained medical provider performing the examination typically addresses this anxiety. In many CAC settings, the client is introduced to the examination by nonmedical personnel. Therefore, it is essential for nonmedical MDT members and CAC staff to have the training needed to explain the nature and purpose of a medical evaluation, and to respond to common questions, concerns, and misconceptions, to similarly ease anxiety.

## Essential Component J

Findings of medical evaluations are shared with the MDT in a routine, timely and meaningful manner.

### STATEMENT OF INTENT

Because the medical evaluation is an important part of the response to suspected child abuse and neglect, findings of the medical evaluation should be shared with, and explained to, the MDT in a routine and timely manner to facilitate discussion of concerns, and ensure case decisions can be made effectively. The legal duty to report findings of suspected child abuse to child protective services is an exception outlined by the HIPAA privacy requirements, allowing for ongoing relevant communications between and among the members of the MDT.



Standard 06

# Mental Health

Evidence-based, trauma-focused mental health services, designed to meet the unique needs of the child and caregivers, are consistently available as part of the multidisciplinary team response.



Case 4:22-cv-00017-SLG    Document 79-5    Filed 01/31/24    Page 43 of 78    EXHIBIT E
Page 43 of 78

# 06. Mental Health

## Rationale

A CAC's mission is to promote and foster safety, healing and justice for children and families. The common focus of the MDT is to foster healing and avoid potential retraumatization of children and families by the systems designed to respond to their needs. The CAC's response begins at first contact with the child and family. Without effective therapeutic intervention, many children who have experienced trauma may suffer ongoing or long-term adverse social, emotional, developmental and health outcomes. Evidence-based treatments and other practices with strong empirical support help reduce the impact of trauma and the risk of future abuse and other negative consequences. For these reasons, an MDT response must include screening for trauma exposure and/or symptoms by identified members of the MDT as part of the MDT response, who then use that information to link to mental health services for assessment and trauma-focused mental health treatment for child victims and caregivers.

Evidence shows parental/family support is often the key to the child's recovery and ongoing protection, and mental health services are often an important factor in a caregiver's capacity to support their children. Therefore, family members may benefit from counseling and support that aids in addressing the emotional impact of abuse allegations and related emotional triggers, and in reducing or eliminating the risk of future abuse. Mental health treatment for caregivers is a critical component of CAC services, given that many may have trauma histories themselves or are current victims of intimate partner violence. Such services include information, support and coping strategies for themselves and their children about sexual abuse, dealing with issues of self-blame and grief, family dynamics, parenting education and the impact of abuse and trauma histories. Siblings, other children in the family such as cousins, and, in some cases, extended family members may also benefit from opportunities to discuss their own reactions and experiences and to address family issues within a confidential therapeutic setting. The nature of the impact on children and families underscores the importance of collaboration with community providers to improve outcomes for their health and well-being. The CAC case review process provides a vehicle for these collaborative discussions.

## Essential Component A

Mental health services are provided by professionals trained in delivering trauma-focused, evidence-supported mental health treatment. All mental health providers for CAC clients, whether providing services on-site or by referral and linkage agreement with outside individuals and agencies, must meet the following training and education/license requirements:

### EDUCATION/LICENSE REQUIREMENT

1. The CAC must demonstrate that its mental health provider(s) meets at least ONE of the following academic training standards:

   A. Master's degree/licensed/certified in a related mental health field.

   B. Master's degree in a related mental health field and working toward licensure; supervised by a licensed mental health professional.

C. Student intern in an accredited mental health related graduate program, when supervised by a licensed/certified mental health professional. Both the student intern and supervising licensed mental health professional must meet the indicated 40-hour training requirements. Students who are currently enrolled in a training to deliver an EBT may provide services to children as a part of their EBT training.

**TRAINING REQUIREMENT**

2. The CAC must demonstrate its mental health provider(s) has completed 40 contact hours in training and consultation calls to deliver an evidence-supported mental health treatment to children who have experienced trauma from abuse. (Examples include TF-CBT, PCIT, AF-CBT, CFTSI, EMDR — see "Putting Standards into Practice"). Training programs that include fewer than 40 hours (including consultation calls) may be supplemented with contact hours in evidence-based assessment.

# Essential Component B

Clinicians providing mental health treatments to CAC clients must demonstrate completion of continuing education in the field of child abuse, trauma, clinical practice and/or cultural applications consisting of a minimum of eight contact hours every two years.

**STATEMENT OF INTENT**

Because new research constantly emerges regarding the efficacy of mental health treatment modalities and the importance of ensuring cultural relevance of said services, it is vital for clinicians to remain updated about new research, evidence-supported treatment methods, and developments in the field that would help ensure the delivery of high-quality, relevant, and accessible services to clients.

# Essential Component C

Evidence-supported, trauma-focused mental health services for the child client are consistently available and include:

1. Trauma-specific assessment of traumatic events and abuse-related trauma symptoms to determine the need for treatment;

2. Evidence-based assessments to inform treatment;

3. Individualized treatment plan based on assessments that are periodically reassessed;

4. Individualized evidence-supported treatment appropriate for the child clients and other family members;

5. Child and caregiver engagement in treatment;

6. Monitoring of trauma symptom reduction;

7. Referral to other community services as needed.

All services should be culturally informed and culturally responsive.

**STATEMENT OF INTENT**

The above description of services should guide discussions about expectations with all professionals who may provide mental health services, whether on-site or by referral and linkage agreement. This will ensure that appropriate, relevant, and accessible services are available for child clients and that the services are outlined in linkage agreements.

# Essential Component D

Mental health services are available and accessible to all CAC clients regardless of their ability to pay.

**STATEMENT OF INTENT**

CACs have a responsibility to identify and secure alternative funding sources to ensure all children and caregivers have access to appropriate, specialized mental health services.

# Essential Component E

The CAC/MDT's Interagency Agreement/MOU or written protocols and guidelines include access to appropriate trauma-informed mental health assessment and treatment for all CAC clients.

**STATEMENT OF INTENT**

Because mental health is a core component of a CAC's multidisciplinary team response, the CAC/MDT's Interagency Agreement/MOU or written protocols and guidelines must detail how such care may be provided and accessed by all CAC clients.

# Essential Component F

The CAC/MDT's written protocols and guidelines define the role and responsibility of the mental health professional(s) on the MDT, to include:

1. Attending and actively participating in MDT case review and case management

2. Sharing relevant information with the MDT while protecting the clients' right to confidentiality and the mental health professional's legal and ethical requirements

3. Serving as a clinical consultant to the MDT regarding child trauma and evidence-based treatment

4. Monitoring and sharing with the MDT the child's and caregiver's engagement in, and completion of, treatment.

**STATEMENT OF INTENT**

Evidence shows the importance of collaboration among community professionals serving children and families to improve outcomes. A trained mental health professional participating in the MDT case review process assures that the child's and caregiver's treatment needs and mental health can be monitored, assessed and reassessed, and taken into account as the MDT makes case decisions. In some CACs, the child's and caregiver's treatment provider(s) serves in this role; in others, it may be a mental health consultant.

# Essential Component G

The CAC/MDT's written protocols and guidelines include provisions about the sharing of mental health information and how client confidentiality and mental health records are protected in accordance with state and federal laws.

**STATEMENT OF INTENT**

The forensic process of gathering evidentiary information and determining what the child may have experienced is separate from mental health treatment processes. Mental health treatment is a clinical process designed to assess and mitigate the long-term adverse impacts of trauma and/or other diagnosable mental health conditions. Every effort should be made to maintain clear boundaries between these roles and processes.

Each CAC must be aware that medical and mental health treatment records containing identifiable protected health information (PHI) are protected by HIPAA. Records pertaining directly to an investigation of child abuse can be exempt from HIPAA and do not require caregiver consent for release. The CAC should maintain a log of disclosures of medical and mental health treatment information per HIPAA regulations.

MDT protocol must include specific guidelines for the MDT and mental health providers regarding what and how information can be shared with the MDT during case review, in accordance with state laws and professional ethical practice standards.

# Essential Component H

The CAC must provide services for caregivers to address:

1. Safety and well-being of the child

2. Caregiver involvement in their child's treatment when appropriate

3. Emotional impact of abuse allegations

4. Risk of future abuse

5. Issues or distress that the allegations may trigger, including own history of trauma and/or current experience of abuse, violence and/or other trauma

These services may be provided directly by the CAC and/or with linkage agreements with other appropriate providers.

**STATEMENT OF INTENT**

Evidence clearly demonstrates that caregiver support is essential to sibling support, the recovery of children directly experiencing or exposed to abuse and violence, and overall family functioning and well-being. CACs have long provided such supportive services for caregivers and siblings through support groups, mental health services and ongoing follow-up, either on-site or by linkage agreement.

It is important to consider the range of mental health issues that could impact the child's recovery or safety with particular attention to the caregiver's mental health, substance abuse, domestic violence, and other trauma history. Caregivers, siblings, and other family members may benefit from assessment, support, and mental health treatment to address the emotional impact of abuse allegations, reduce or eliminate the risk of future abuse, and address issues that the allegations may trigger. Assessments and supports may be provided by clinicians, victim advocates or others, either on staff at the CAC or via linkage agreement.

# Essential Component I

Clinicians providing mental health treatment services to CAC clients must participate in ongoing clinical supervision and/or consultation.

**STATEMENT OF INTENT**

Clinical supervision and/or consultation with others trained in evidence-based treatment is necessary to ensure appropriate and quality services to the clients. Moreover, this clinical supervision is required for licensure in many states. Individual and/or group supervision options for meeting this standard include:

- Supervision by a senior clinician on staff at the CAC

- Supervision with a senior clinician in the community who serves children and families and accepts referrals from the CAC (when a CAC does not have more than one clinician)

- Participation in a supervision call with mental health providers from other CACs within the state, either individually or as a group

- Participation in a State Chapter or one or more CAC contracts with a senior clinician to provide supervision and consultation calls



Most clinical professions (i.e., clinical social workers, licensed professional counselors, marriage, and family therapists, etc.) have a structure for clinicians to become clinical supervisors. CACs may wish to investigate this option in their state. CACs can also negotiate Trauma-Focused Cognitive Behavior Therapy (TF-CBT) master trainers for ongoing clinical consultation. As supervision for one evidence-based treatment does not necessarily encompass all the clinical interventions needed within a CAC, comprehensive interventions will need to be addressed throughout ongoing clinical supervision.





EXHIBIT E
Page 48 of 78

Standard 07

# Case Review and Coordination

A formal process in which multidisciplinary discussion and information sharing regarding the investigation, case status and services needed by the child and family is to occur on a routine basis.



Case 4:22-cv-00017-SLG     Document 79-5     Filed 01/31/24     Page 49 of 78     EXHIBIT E
Page 49 of 78

# 07. Case Review and Coordination

## Rationale

Case review is the formal process that enables the MDT to monitor and assess its independent and collective effectiveness so as to ensure the safety and well-being of children and families. The process encourages mutual accountability and helps to assure that children's and families' needs are met sensitively, effectively and in a timely manner. Case review serves multiple purposes:

- Experience and expertise of MDT members is shared and discussed

- Collaborative efforts are fostered

- Formal and informal communications are promoted

- Mutual support is provided

- Protocols and procedures are reviewed

- Informed, collective decisions are made

- Services are coordinated

Case review must occur at least once a month. Its focus is on planning and monitoring current cases. It is a formal process that serves as a complement to ongoing case discussions among the MDT partners. Every CAC must implement a defined process and set the case criteria for review. The method and timing of case review may vary to fit the unique needs of a CAC community. For example, some CACs review every open case, while others review only complex or problematic cases or cases involved in prosecution. Representatives from each core discipline on the MDT must participate and provide input at case review. Confidentiality should be addressed in the CAC's written protocols or guideline, in keeping with state and/or federal laws and professional ethics that govern information sharing among MDT members, including during case review.

## Essential Component A

The CAC/MDT's written protocols/guidelines include criteria for case review and case review procedures.

The CAC/MDT's written documents must include:

1. Purpose of meetings

2. Frequency of meetings

3. Designated attendees

4. Case selection criteria and process for developing case review agenda

5. Designated facilitator and/or coordinator

6. Mechanism for distribution of agenda and cases to be discussed

7. Procedures for addressing follow-up recommendations

8. Location of the meeting — may be in person or virtual

### STATEMENT OF INTENT

To maximize efficiency and to enhance the quality of a comprehensive case review, the CAC's written documents clearly define the process and expectations for all MDT partners.

# Essential Component B

An intentional forum for the purpose of reviewing, collaborating, and coordinating cases is conducted at least once a month.

**STATEMENT OF INTENT**

Case review affords the MDT the opportunity to review active cases, provide updated case information, address obstacles to effective investigations and service delivery, and coordinate interventions. It is a planned, regularly scheduled meeting of all MDT partners and occurs at least once a month for cases coming from the CAC's primary service area. Case review is a formal process that is conducted in addition to informal discussions and pre- and post-interview meetings.

# Essential Component C

MDT partner agency representatives actively participating in case review must include, at a minimum:

1. Law enforcement
2. Child protective services
3. Prosecution
4. Medical
5. Mental health
6. Victim advocacy
7. Children's Advocacy Center

**STATEMENT OF INTENT**

Full MDT participation at case review allows for the contributions of diverse professional perspectives and expertise to optimize informed decision-making, case planning and coordinated service delivery. Case review must be attended by the identified agency representatives capable of making, informing and/or advocating for independent and collective decisions and providing the team with knowledge and expertise of their specific professions. All those participating should be familiar with the CAC/MDT process and the purpose and expectations of case review. Forensic interviewers, irrespective of which agency employs them, must be present at case review. Moreover, it is strongly encouraged that case review participants be those who are actively working on the cases under review in order to ensure direct communication between all parties. This does not preclude additional agency representatives or supervisors from participating as well. Participation in person is optimum; however, participation can be accomplished virtually as necessary to ensure the participation of all required disciplines and to respond to public health emergencies.

# Essential Component D

Case review is an informed and collaborative decision-making process with input from all MDT partner agency representatives.

Generally, the case review process should include:

- Review of forensic interview outcomes
- Discussion, planning and monitoring of the progress of the investigation
- Review of medical evaluation findings
- Discussion of child protection and other safety issues
- Input for prosecution and sentencing decisions
- Discussion of emotional support and treatment needs of children and family members and strategies for meeting those needs
- Assessment of the family's reaction and response to the child's disclosure and involvement in the criminal justice and/or child protection systems
- Review of criminal and civil (dependency) case updates and ongoing involvement with the child and family as well as disposition

- Provisions for court education and court support and accompaniment

- Discussion of issues of cultural relevance and needs unique to individual children and families, including issues pertaining to access to services

- Ensuring that all children and families are afforded the legal rights and comprehensive services to which they are entitled

- Discussion of how the CAC and MDT intervention is impacting the child and their family, including positive changes and challenges

- Child well-being and outcomes, as available

## STATEMENT OF INTENT

In order to make informed case decisions, optimize service delivery and improve client outcomes, essential information and professional expertise are required from all disciplines. Decisions and interventions must be made with the input, discussion and support of all involved professionals, and efforts must be coordinated, comprehensive and nonduplicative. The process and facilitation must ensure there is equitable participation and discussion among all MDT members to adequately address their respective and shared goals, mandates, interventions and services, questions, concerns, and outcomes.



Standard 08

# Case-Tracking

—

Children's Advocacy Centers must develop and implement a system for monitoring case progress and tracking case outcomes for all MDT components.



# 08. Case-Tracking

## Rationale

Case-tracking systems are able to collect and document essential demographic and case information and investigation/intervention outcomes as well as generate statistical reports. The data collected is useful for monitoring ongoing case progress and program evaluation to inform continuous quality improvement, enabling MDT members to provide accurate information on the current status and disposition of cases to clients, and providing critical support for seeking funding and responding to grant requirements.

Data collected nationally from all local programs, relevant statewide and regionally, are useful for advocacy, research, and legislative purposes to advance the field of child maltreatment. It may also be required for federal funding reporting requirements. Each CAC utilizes the case-tracking system that suits its determined needs and is able to be supported by its available resources. Any case-tracking system implemented must be compliant with all applicable privacy and confidentiality requirements.

## Essential Component A

The CAC/MDT's written protocols/guidelines includes the case-tracking process and information gathered through case closure at the CAC, including final civil and/or criminal disposition.

### STATEMENT OF INTENT

Case tracking provides a mechanism for monitoring case progress throughout the multidisciplinary interagency response.

Often, MDT members will have a system to collect their own agency data; however, the MDT response requires the sharing of this information among its members to better inform individual and collective decision-making, ensure accurate updates to children and families, and inform quality improvements in coordinated service delivery. The CAC/MDT's written documents must detail the CAC's purpose, information to include, and a process for case tracking.

## Essential Component B

The CAC tracks and, at a minimum, is able to retrieve and report NCA Statistical Information.

NCA statistical information includes the following data:

1. Demographic information about the child and family

2. Demographic information about the alleged offender

3. Type(s) of alleged abuse

4. Relationship of alleged offender to child

5. MDT members' involvement with children and families and relevant outcomes

6. Criminal charges filed and case dispositions

7. Child protection outcomes

8. Status/follow-through of medical and mental health referrals

CACs are required to demonstrate the ability to collect and retrieve case-specific information for all CAC clients. This includes basic demographic information, services provided, and outcome information contributed by MDT partner agencies in a thorough and timely fashion. Codifying case-tracking procedures in CAC/MDT's written documents underscores its importance and helps to assure the MDT members are accountable to each other and, ultimately, to the children and families they individually and collectively serve.

## Essential Component C

An individual is identified to implement the case-tracking process.

**STATEMENT OF INTENT**

Case tracking is an important function of the CAC that requires dedicated time and accuracy in its implementation. A designated individual(s) must be identified to implement and/or oversee the case-tracking process, and the number and type of individual(s) charged with this responsibility is determined by the CAC's staffing and case volume. Some CACs define case tracking as part of the MDT coordinator's or case manager's role. Some dedicate a staff position, part- or full-time, for data collection and database maintenance, or assign the responsibility to an administrative assistant. Other programs utilize trained volunteers (who have signed confidentiality agreements) to input data.

## Essential Component D

The CAC/MDT's written protocols/guidelines must outline how MDT partner agencies can access case-specific information and aggregate data for quality assurance, quality improvement, funding, and research purposes.

**STATEMENT OF INTENT**

Because case data may be useful to MDT members for a variety of purposes, it is important that all members have access to aggregate and/or specific case information as determined through discussions with all participating agencies. Policies must also include how the release of this data to participating agencies and other parties complies with confidentiality requirements.

## Essential Component E

The CAC collects client feedback to inform client service delivery.

**STATEMENT OF INTENT**

Continuous quality assurance is the hallmark of a well-functioning CAC. This requires seeking feedback directly from clients regarding their experiences with all aspects of CAC services so that improvements may be made as needed on an ongoing basis. Soliciting client feedback can be accomplished through the use of various tools including, but not limited to, client satisfaction surveys. To optimize the quality of the feedback received, survey instruments need to be valid and reliable. CACs that actively participate in NCA's Outcome Measurement System (OMS) can be assured they meet and exceed this requirement.

**08. Case-Tracking**





Standard 09

# Organizational Capacity

A designated legal entity responsible for program and fiscal operations has been established and implements basic sound administrative policies and procedures.



# 09. Organizational Capacity

## Rationale

Every CAC must have a designated legal entity responsible for the governance and implementation of its operations. This entity oversees ongoing business practices of the CAC, including setting and implementing administrative policies, hiring, and managing personnel, obtaining funding, supervising program and fiscal operations, and long-term planning. CAC organizational structure depends upon the unique needs and resources of its community; it may be an independent nonprofit agency, a component of an umbrella organization such as a hospital or nonprofit human service or victim service agency, or part of a governmental entity, such as prosecution, social services, or law enforcement. Each of these options has strengths, limitations and implications for collaboration, planning, governance, community partnerships and resource development. Regardless of where the program is housed or under what legal auspices, all CACs must create a structure such that participating agencies feel equal investment in, and collaborative responsibility for, its operations and services.

## Essential Component A

The CAC is an incorporated, private nonprofit organization, government-based agency, tribal entity, or a component of such an organization, agency, or tribal entity.

### STATEMENT OF INTENT

The CAC has a defined organizational identity that ensures appropriate legal and fiduciary governance and organizational oversight. This is critical to the ability to maintain, grow and ensure sustainability of the CAC and all of its components and services.

## Essential Component B

The CAC maintains, at a minimum, current general commercial liability, professional liability, directors' and officers' liability, and cyber liability insurance as appropriate for its organization.

### STATEMENT OF INTENT

Every CAC must provide appropriate insurance for the protection of the organization and its personnel. Nonprofit CACs, including those that are a component of an umbrella nonprofit or nonprofit hospital, must carry, at a minimum, general commercial liability, professional liability, cyber liability, and directors' and officers' liability insurance. Government-based CACs must carry, at a minimum, general commercial liability, professional liability, and cyber liability insurance or provide documentation of comparable coverage through self-insurance. CACs should consult with appropriate risk management professionals to determine appropriate types of insurance and any additional levels of coverage needed, including renters, property owners and automobile insurance, depending upon their individual needs.

## Essential Component C

The CAC has administrative policies and procedures that apply to staff, board members, volunteers, and clients.

Every CAC must have written policies and procedures that govern its administrative operations. Administrative policies and procedures must include, at a minimum:

1. Personnel policies, procedures, and documents

A. Job descriptions for all positions

B. Anti-discrimination policy

C. Conflict of interest policy

D. Whistleblower policy

E. Social media use policy

2. Financial management policies and procedures

A. Accounting policies and procedures that demonstrate adequate internal controls and segregation of duties

B. Credit card usage policy

3. Safety and security policies and procedures

A. Code of conduct (this should guide behavior between staff, between staff and team members, and between staff/team members and clients)

B. Child protection policies, including the obligation to report abuse

C. Emergency response policies

D. Building security and safety policy and procedures

E. Anti-Violence in the Workplace policy

F. Weapons on premises policies and procedures

G. Drug usage policy

H. Smoke-free environment

4. Information technology policies

A. Document retention and destruction policies

B. Data security policies

C. Confidentiality policies — HIPAA requirements

## STATEMENT OF INTENT

The CAC has clearly developed organizational policies and procedures that ensure appropriate administrative governance. This is critical to the ability to maintain, grow and ensure sustainability of the CAC and all of its components and services.

# Essential Component D

The CAC is required to conduct an annual independent financial audit when its annual actual expenses meet or exceed $750,000. Organizations whose annual gross expenses fall below $750,000 and meet or exceed $200,000 must conduct a CPA-completed financial review. Those organizations with gross annual expenses below $200,000 must provide their Board-approved financial statements.

## STATEMENT OF INTENT

Confidence in the integrity of the fiscal operations of the CAC is critical to the long-term sustainability of the organization. An annual independent audit is one tool to assess for fiscal soundness and internal controls for financial management. A financial review is sufficient for those CACs with annual actual expenses equal are less than $750,000 and that meet or exceed $200,000. CACs with annual budgets below $200,000 must provide their Board-approved financial statements.

Reporting Requirements for Audited Financial Statements: All centers with annual actual expenses (as determined by United States generally accepted accounting principles) that meet or exceed $750,000 are required to have an audit of their financial statements. If a management letter is prepared by the independent accountant (CPA), it should be included with the audit report.

Reporting Requirements for Reviewed Financial Statements: All centers with annual actual expenses (as determined by United States generally accepted accounting principles) less than $750,000 that meet or exceed $200,000

are required to have a review of their financial statements. The review must be in compliance with SSARS 19. If a management letter is prepared by the independent accountant (CPA), it should be included with the review report.

# Essential Component E

The CAC has, and demonstrates compliance with, written screening policies for staff, board members and volunteers that include national criminal background, sex offender registration, and child abuse registry checks, and it provides training and supervision to staff and on-site and/or ongoing volunteers. In discussion with its Board and MDT, a CAC must determine what is a disqualifying finding in a background check.

**STATEMENT OF INTENT**

Due to the sensitive and high-risk nature of CAC work, it is imperative that the CAC conduct a formal screening process for staff. This process should be documented in a written policy. Staff must receive initial and ongoing training and supervision relevant to their role.

In addition, volunteers perform a wide variety of functions within CACs, and CACs can attract volunteers who are emotionally unprepared for the nature and expectations of the work and/or individuals who have potential to be, or have current or past histories as, offenders. Due to the sensitive and high-risk nature of CAC work, it is imperative that the CAC also conducts a formal screening process for on-site volunteers. Upon placement, volunteers must receive training and supervision relevant to their roles.

For similar reasons, screening must be conducted for board members as they serve and publicly represent the CAC in a variety of ways, both on- and off-site.

# Essential Component F

The CAC has a written succession plan to ensure the orderly transition and continued operation of the CAC.

**STATEMENT OF INTENT**

A succession plan assists in guiding the CAC through, and safeguarding the CAC against, unplanned or unexpected changes. This kind of risk management, mission and business continuity is equally important in facilitating a smooth transition when leadership change is predictable and planned. A succession plan outlines leadership development and emergency responsibilities for the CAC, and it reflects its commitment and helps ensure a sustained, healthy functioning organization. The plan should be developed specific to the uniqueness of the CAC and include, at a minimum:

- Temporary staffing strategies

- Long-term and/or permanent leadership replacement procedures

- Cross-training plan

- Financial considerations

- Communication plan

- Key positions/functions essential to the operation of the CAC

# Essential Component G

The CAC has addressed its sustainability through the implementation of a current strategic plan approved by the governing entity of the CAC.

**STATEMENT OF INTENT**

In order to assure long-term viability of the organization, the CAC must have a plan that addresses programmatic and operational needs. The governing entity for such a plan

may be an oversight committee or a board of directors, as appropriate for the individual CAC's organizational structure and needs.

In general, in order to be considered current, a strategic plan should be no more than three to five years old. It should be actively implemented, and there should be a mechanism in place to monitor the progress on the plan.

Plan should include at, a minimum:

- Stakeholder input in plan creation
- Goals, objectives, and timeline
- Review and approval by CAC board or relevant governing body

# Essential Component H

The CAC promotes employee well-being by providing training and resources regarding the effects of vicarious trauma, providing techniques for building resiliency, and maintaining organizational and supervisory strategies to address vicarious trauma and its impact on staff.

### STATEMENT OF INTENT

To help ensure the health and well-being of all employees and improve employee retention, the CAC must raise awareness about the impact of work-related trauma exposure through training and develop organizational practices that identify and mitigate against negative consequences for staff, the delivery of quality of services, and staff turnover. This includes identifying the risk of vicarious trauma for frontline staff and those exposed to the associated trauma of the work more indirectly. It also includes providing techniques for individual self-care and resiliency building as well as integrating and maintaining organizational and supervisory strategies to address and respond to vicarious trauma among all staff.

# Essential Component I

The CAC provides training opportunities and resources on vicarious trauma and building resiliency to all MDT members.

### STATEMENT OF INTENT

CACs have a primary role in building and enhancing the functioning of the MDT. A highly functioning MDT assures vicarious trauma is acknowledged and addressed and has an awareness and understanding of the importance of work-related trauma exposure and its potential consequences. While MDT partner agencies have primary responsibility for the health and well-being of their respective staff, the CAC is responsible for providing access to training, ongoing recognition, and discussion and strategies to collaboratively address vicarious trauma and help build team members' resiliency. Moreover, the health of the MDT as a whole directly impacts service delivery to children and families. Therefore, attention to this issue is important for helping to ensure high-quality services and improve outcomes for abused children and families.





EXHIBIT E
Page 62 of 78

Standard 10

# Child Safety and Protection

The CAC is comfortable, private and both physically and psychologically safe for diverse populations of children and their family members.



10. Child Safety and Protection

# 10. Child Safety and Protection

## Rationale

A CAC requires a separate, child/youth-focused setting that provides a safe, comfortable, and neutral place where forensic interviews and other CAC services can be appropriately provided for children and families. While every center may look different, the criteria below help define specific ways the environment can help children and families feel physically and psychologically safe and comfortable. These include making sure the physical setting meets basic child safety standards, ensuring alleged offenders do not have access to the CAC, providing adequate supervision of children and families while they are on the premises, and creating a welcoming environment that reflects the diversity of clients served.

There is no one right way to build, design or decorate a CAC. The CAC should have adequate square footage for its determined on-site operations and conform to generally accepted safety and accessibility guidelines, fire codes, etc. Consideration should be given to future growth and the need for additional space as caseloads increase and additional program components are needed. Care should be taken to ensure MDT members have access to workspace and equipment on-site to carry out the necessary functions associated with their roles on the MDT, including, but not limited to, meeting with families, participating in forensic interviews and sharing necessary information.

Special attention should be given to designing and decorating the client service areas to reflect the community's diverse population. The appearance of the CAC can help facilitate the participation of children and families in the process, largely by helping alleviate anxiety and instill confidence and comfort in the intervention system. It should communicate, through its design, decor, and materials, that the CAC is a welcoming place for all children and their nonoffending family members.

## Essential Component A

The CAC is a designated, task-appropriate facility or space that:

1. Is maintained in a manner that is physically and psychologically safe for children and families

2. Provides observation or supervision of clients within sight or hearing distance by CAC staff, MDT members or volunteers at all times

3. Is convenient and accessible to clients and MDT members

4. Is appropriate for the delivery of CAC services

5. Provides age-appropriate and culturally diverse toys and other resources that are childproofed, cleaned, and sanitized to be as safe as possible.

### STATEMENT OF INTENT

The CAC is a child focused setting that ensure both physical and psychological safety for all children and families. Special attention should be paid to the location, design and accessibility of the CAC for the children, families and MDT members that utilize the center.

10. Child Safety and Protection

# Essential Component B

The CAC has, and abides by, written policies and procedures that ensure separation of victims and alleged adult offenders during the investigative process and throughout delivery of services at the CAC. CACs may provide services to youth with problematic sexual behaviors, but they must have developed and implemented appropriate safety protocols to protect other children receiving services at the CAC.

## STATEMENT OF INTENT

The CAC has written policies and procedures that ensure the separation of victims and alleged offenders during the investigative process and throughout delivery of the full array of CAC services. During the investigative process, logic dictates that children will not feel free to disclose abuse if an alleged offender accompanies them to the interview and/or remains on location throughout the duration of intervention. This separation of children from alleged offenders should also extend to children and perpetrators in unrelated cases. In addition, caregivers may also be at risk of abuse and violence by alleged offenders and are in need of physical and psychological safety for themselves and their children. If a CAC shares space with an existing agency that provides services to offenders, facility features and scheduling must assure separation between children and family members and alleged offenders.

Many CACs serve a vital role in their communities by providing services for children with problematic sexual behaviors. CACs that offer services to this population should have policies and procedures in place to maintain physical and psychological safety for other child victims and their families visiting the CAC.

# Essential Component C

The CAC makes reasonable accommodations to make the facility physically accessible.

## STATEMENT OF INTENT

This requirement is for new buildings and custom-designed facilities. CACs operating in older buildings or facilities must make reasonable accommodations to make the facility physically accessible to clients and family members, CAC staff and MDT members. If the CAC cannot be structurally modified, arrangements for equivalent services should be made at alternate locations within or outside the facility. CACs must be in compliance with guidelines stipulated in the Americans with Disabilities Act (ADA) and/or state legislation.

# Essential Component D

Separate and private area(s) are available for confidential case consultation and discussion, for meetings or interviews, and for clients awaiting services.

## STATEMENT OF INTENT

To ensure a physically and psychologically safe environment for children and families, confidentiality and respect for client privacy is of paramount concern in a CAC. CAC staff and MDT members require privacy to discuss cases with children or families in a location where visitors or others not directly involved with the case may overhear them. Separate areas should also be available for private family member interviews and so that individual family members may privately discuss aspects of their case with staff and MDT members. Care should be taken to ensure that private meeting areas are not only physically separate but also soundproofed, so conversations cannot be overheard. Some centers place soundproofing materials in or on walls when building or refurbishing their centers. Others place stereos or sound machines in rooms to block sound.

## Essential Component E

CACs are required to implement a code of conduct for staff and MDT members ensuring the safety of children and families. The code of conduct must include child abuse prevention practices. Staff members must have received and agreed to the code of conduct. MDT members must be informed of the CAC's code of conduct and the expectation that it guides work within the CAC.

Code of conduct content must include:

- Child safety and well-being as a primary priority and value in the CAC and one that guides policy and practice decisions.

- Contact not related to CAC service provision between staff and a child/client is prohibited.

- Physical contact between child/client and staff/MDT members must be consistent with the safety and well-being of the child/client.

- Staff interaction with child clients should be interruptible and/or observable.

- It is the duty of staff to report suspected child abuse.

**STATEMENT OF INTENT**

A code of conduct is a set of rules around the behavior for CAC staff and MDT members, and it acts as an explicit expression of personal and professional expectations in their work with one another and with clients. It also serves as an external statement of the CAC/MDT's commitment to its core values and principles for interdisciplinary, cross-agency work. In addition, a code of conduct helps provide for a healthy work environment for staff and MDT members, and thereby helps ensure the delivery of high-quality, relevant, and accessible child- and family-centered services. In the event of any violations of stated codes of conduct, it also provides an understanding of how to report and/or address them.

## Essential Component F

A child safety assessment must be conducted annually to ensure that the building and CAC space is a safe and child-focused setting for children and their families.

**STATEMENT OF INTENT**

Core to CACs is their ability to provide a setting that underscores the critical importance of providing and/or restoring a sense of safety, both physically and psychologically, for children and families in crisis. Safety must be assured if children and families are able to participate in forensic interviews, investigations, evaluations and identified services. As such needs and safety measures change or are updated, assessments must be conducted at least annually.

## Essential Component G

CAC staff are mandatory reporters. CACs are required to ensure that mandated reporter training is provided to all staff and volunteers. Updates to state statutes and mandated reporter laws must be provided to staff and volunteers annually, if applicable.

**STATEMENT OF INTENT**

Given the nature of the work of CACs/MDTs, all those involved in the delivery of services to children and families must be trained and understand the requirements of mandated reporter laws and the procedures for reporting known or suspected instances of child abuse and neglect. Annual training is important to ensure that changes in the law and/or agency reporting procedures can be understood and observed.



**10. Child Safety and Protection**



# Medical Evaluation Standard Appendices

EXHIBIT E
Page 67 of 78

# Appendix **1**

## Medical History for Child Sexual Abuse

**COMMON COMPONENTS OF MEDICAL HISTORY FOR POSSIBLE SEXUAL ABUSE**
(Needed to guide testing, treatment and make diagnosis)

Sources: Child, Parent/caregiver, Investigator/FI, social work/advocate, medical records. Coordination and collaboration should occur to avoid duplication in the child being asked to recount details of the abuse event.

**History of Present Illness (HPI):**

- History of the event:
  - What happened, when, where, who was involved

- History of the contact:
  - Body sites involved, actions involved, associated symptoms

- What has happened since the event?
  - Physical/emotional symptoms/behavioral response
  - Safety threats, bullying, school performance
  - Family relationships

- What response has already occurred?
  - Prior medical exam and treatment
  - Interview by investigators or CAC staff
  - Counseling/mental health screening

**Past Medical History (PMH):**

- Significant Illnesses/Surgeries/Hospitalizations

- Development (including sexual development and menstrual history in girls)

- Behavioral, educational or mental health issues

- Prior abuse and sexual history including consensual partners

- Medications, allergies and vaccination history (esp. HPV and Hep B)

**Family History (FH):**

- Significant health problems in parents, siblings and close relatives.

**Social History (SH):**

- Home composition, violence in the home, substance abuse by patient or those in the home.

- Does the patient feel safe and supported by current caretakers?

- Prior child welfare involvement in the family.

Review of Body Systems (ROS): Ongoing or current problems/concerns (usually 10 systems)

- HEENT - Head, Eyes, Ears, Nose, Throat

- Respiratory-breathing

- Cardiac- heart

- Hematology- bruising or bleeding

- Endocrine - glands,weight gain/loss

- Neurology-headaches, seizures, balance

- Gastrointestinal-nausea, vomiting, constipation, diarrhea, rectal pain/bleeding/DC

- Genitourinary-discharge, burning, dysuria, bleeding, pain, lesions

- Musculoskeletal-(muscles, bones and joints

- Skin- rashes, lesions, tattoos, bruises

# Appendix **2**

## IMPORTANT DEFINITIONS

### Didactic Training

Didactic training for CAC medical providers should cover examination positions (supine, lateral, knee chest), examination techniques (gathering of forensic evidence, samples for STI testing, labial traction, use of cotton swab with pubertal females to demonstrate edges of hymen, foley catheter, etc), and the review of multiple examples of:

A. anatomical variants

B. acquired or developmental conditions that mimic abuse

C. accidental trauma and sexual abuse trauma

D. STIs and forensic evidence

### Competency Based Clinical Preceptorship

A preceptorship has a clinical training component that provides observation and training with an experienced examiner. The length of the preceptorship is determined by the time it takes the trainee to demonstrate competency in obtaining medical history, using appropriate exam techniques, obtaining diagnostic quality photo-documentation, and applying strategies for testing and prophylaxis for STIs and pregnancy.

## TABLE 1: MEDICAL DISCIPLINES, NCA TRAINING REQUIREMENTS AND CREDENTIALING ENTITY

| | | Foundational Training Requirements | NCA Training Requirements | Licensing Entity |
|---|---|---|---|---|
| **Physician (MD or DO)** | | Undergraduate Degree<br>4 years of Medical School<br>3 years of Residency<br>1-3 years of Fellowship (optional) | ✔️<br><br>16 hours of formal didactic training in the medical evaluation of Child Sexual Abuse | State Medical Board |
| | **Pediatrics, Family Medicine, or other physician,** | Undergraduate Degree<br>4 years of Medical School<br>3 years of Residency | | State Medical Board |
| | **Child Abuse Pediatrician** | Undergraduate Degree<br>4 years of Medical School<br>3 years of Residency<br>3 years of Child Abuse Fellowship<br>Board certification in Child Abuse Pediatrics | *No additional training requirements* | State Medical Board |

| | Foundational Training Requirements | NCA Training Requirements | Licensing Entity |
|---|---|---|---|
| **Advance Practice Nurse (APRN), Nurse Practitioner (NP), Pediatric Nurse Practitioner (PNP)** | Undergraduate Degree<br><br>2 years of Graduate School<br><br>Certification Exam | | State Nursing Board |
| | | ✓<br><br>16 hours of formal didactic training in the medical evaluation of Child Sexual Abuse | |
| | | | |
| **Physician's Assistant (PA)** | Undergraduate Degree<br><br>2 years of Graduate School<br><br>Certification Exam | | State Licensing Board |
| **Sexual Assault Nurse Examiner (SANE)- Adult and Pediatric** | Nursing Degree (RN or BSN)<br><br>Licensure Exam<br><br>Adult and/or pediatric and adolescent SANE training consistent with IAFN guidelines<br><br>Competency Based Clinical Preceptorship<br><br>Providers who have completed SANE training and preceptorship may also choose to apply for SANE-A and/or SANE-P certification by IAFN. | ✓<br><br>40 hours of formal didactic training in the medical evaluation of Child Sexual Abuse<br><br>✓<br><br>Competency Based Clinical Preceptorship | State Nursing Board<br><br>Some states have state-specific forensic nursing requirements. |

# Appendix **3**

## Continuous Quality Improvement

### IMPORTANT DEFINITIONS

**Continuous Quality Improvement**

is the process-based, data-driven approach to improving the quality of a product or service. It operates under the belief that there is always room for improving operations, processes, and activities to increase quality.

**Advanced Medical Consultant**

A Child Abuse Pediatrician, Physician or Advanced Practice Nurse who:

1. Has met the minimum training outlined for a CAC provider (see above)

2. Has performed at least 100 child sexual abuse examinations

3. Current in CQI requirements (continuing education and participation in expert review on their own cases)

**Expert Review**

Expert review of examination findings is a de-identified continuous quality improvement (CQI) activity and is NOT a consultation/second opinion.

1. The CAC should nclude in their policies and procedures the documentation procedure for continuous quality improvement .

2. The CAC should track examinations determined to be abnormal, using either a patient log kept in a secured location or through the MDT case review process. The number of abnormal exams and percent of exams reviewed by an expert provider should be available if requested for site review purposes/practice audits.

3. The medical provider or organization who provides the expert review should maintain a de-identified log noting how many times they have provided examination review for a specific provider. Notation of whether consensus was reached is also recommended.

4. A MOU to delineate roles and expectations between the CAC/medical provider and the person serving as the expert reviewer outlining the roles and responsibilities should be considered.

### EXPERT REVIEW

*NCA Medical Standard for Accreditation states that "all medical professionals providing services to CAC clients must demonstrate that 100% of all findings deemed abnormal or "diagnostic" of trauma from sexual abuse have undergone expert review by an advanced medical consultant".*

A. Advanced Medical Consultants as defined above should also have abnormal exams reviewed by another expert.

B. An abnormal exam is one that has acute or healed physical findings in the anogenital area indicating that abuse/assault has occurred. Laboratory testing for STIs or pregnancy and DNA evidence collection are NOT included in the definition of an abnormal exam.

## SAMPLE EXPERT REVIEW LOG

Below is a sample table that can be created in an Excel document or preferred database to track the review of abnormal exams by an advanced medical consultant. It is recommended that every CAC Medical provider keep such a log on file for review by NCA Site Reviewers.

| Date | Site/examiner | Pre/post puberty | Examiner findings/ concerns | Reviewer findings |
|------|---------------|------------------|-----------------------------|-------------------|
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |
|      |               |                  |                             |                   |

**EXHIBIT E**
**Page 72 of 78**

## SAMPLE LANGUAGE FOR MEMORANDUM OF UNDERSTANDING WITH ADVANCED MEDICAL CONSULTANT

### MOU for Expert Review of Examinations with Abnormal Findings

It is understood that the examination review services represent a continuous quality improvement (CQI) activity and are not intended to serve as medical consultation or provision of direct patient care so results of CQI activity should not be documented in the patient's medical record. It is the responsibility of the medical provider of the CAC to document the findings of the examination in the patient's medical record, establish referral protocols with the CAC's medical director, communicate the findings with the appropriate MDT members and be available for case review and court testimony if needed. This MOU for examination review services does not act as or substitute for the role of the local medical director of the CAC.

A process for tracking information from the examination review process is needed for both CQI as well as for application for accreditation/re-accreditation with the National Children's Alliance.

The CAC and/or the medical provider will maintain a de-identified log of the number of cases in which the medical examination was deemed to represent an abnormal examination. An abnormal exam is defined as an exam in which acute or healed genital or anal injuries are identified as consistent with sexual abuse . Abnormal laboratory tests (sexually transmitted infections and pregnancy) and results of biologic evidence collections are not included in the definition of abnormal exams for the purpose of this examination review activity.

The medical provider of the CAC will maintain a log documenting the number of cases with abnormal findings submitted for expert review. Patient information on the log will either be de-identified or maintained in a secure, locked location to protect sensitive health information.

The medical provider serving as the expert reviewer will maintain a de-identified case log listing the date, examiner and whether the reviewer agreed with the examiner's conclusion of abnormal findings on the examination.

Logs should be maintained for a minimum of 5-years to coincide with the cycle for re-accreditation.

CAC Director                                  Date

CAC Medical Provider                          Date

Expert Reviewer                               Date

# Appendix **4**

## Examination Referral and Timing

**IMPORTANT DEFINITIONS**

**Suspected victim of sexual abuse**

A suspected victim of sexual abuse may be identified by the following criteria:

1. Disclosure of abuse

2. Witness of abuse by an adult or child

3. Exposure to high-risk offender (i.e. adult in possession of child pornography, sibling/household contact of a child victim)

**TABLE 2: TIMING OF MEDICAL EXAMINATIONS[1]**

| | Timing of Exam | Medical Indications |
|---|---|---|
| **Indications for emergency evaluation** | Exam scheduled without delay | • Medical, psychological or safety concerns such as acute pain or bleeding, suicidal ideation, or suspected human trafficking<br><br>• Alleged assault that may have occurred within the previous 72 hours (or other state-mandated time interval) necessitating collection of trace evidence for later forensic analysis<br><br>• Need for emergency contraception<br><br>• Need for post-exposure prophylaxis (PEP) for STIs including Human Immunodeficiency Virus (HIV) |
| **Indications for urgent evaluation** | Exam scheduled as soon as possible with qualified provider | • Suspected or reported sexual contact occurring within the previous 2 weeks, without emergency medical, psychological or safety needs identified |
| **Indications for non-urgent evaluation** | Exam scheduled at convenience of family and provider but ideally within 1-2 weeks | • Disclosure of abuse by child, sexualized behaviors, sexual abuse suspected by MDT, or family concern for sexual abuse, but contact occurred more than 2 weeks prior without emergency medical, psychological or safety needs identified |

---

1     Adams JA, Kellogg ND, Farst KJ, Harper NS, Palusci VJ, Frasier LD, Levitt CJ, Shapiro RA, Moles RL, Starling SP, Updated Guidelines for the Medical Assessment and Care of Children Who May Have Been Sexually Abused, *Journal of Pediatric and Adolescent Gynecology* (2015), doi: 10.1016/j.jpag.2015.01.007.

| | Timing of Exam | Medical Indications |
|---|---|---|
| **Indications for <u>follow-up</u> evaluation** | As determined by qualified provider | • Findings on the initial examination are unclear or questionable necessitating reevaluation<br><br>• Documentation of healing/resolution of acute findings<br><br>• Confirmation of initial examination findings, when initial examination was performed by an examiner who had conducted fewer than 100 such evaluations<br><br>• Further testing or treatment for STIs |

## THE 5 P'S

Other indications for medical evaluation even if outside of the DNA collection window

1. Pain/bleeding with/after contact
2. Potential for STI's due to nature of contact
   A. Many STI's do not cause symptoms

3. Perpetrator exposed
   A. Sibling/household contacts of the alleged offender

4. Pornography (child) use by caregiver/household contact
5. Patient/parent concern
   A. Patients often have distorted thoughts of body due to perpetrator manipulation
   B. Initial partial disclosures are common

# Appendix 5

## Disclosure Log for Protected Health Information (PHI)

*Maintain in patient's chart*

| Date | Type of PHI disclosed | Entity receiving PHI | Purpose of Disclosure (Investigation, billing, continuity of care…) | Person making disclosure |
|------|----------------------|---------------------|------------------------------------------------------|-------------------------|
|      |                      |                     |                                                      |                         |
|      |                      |                     |                                                      |                         |
|      |                      |                     |                                                      |                         |
|      |                      |                     |                                                      |                         |
|      |                      |                     |                                                      |                         |
|      |                      |                     |                                                      |                         |
|      |                      |                     |                                                      |                         |
|      |                      |                     |                                                      |                         |
|      |                      |                     |                                                      |                         |
|      |                      |                     |                                                      |                         |

