Kramer and Cosgrove
542 4th Ave., Ste. 207
Fairbanks, Alaska 99701
(907) 888-4098
service@kclawak.com
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JUSTIN ACKER, EMILY ACKER, E.A. (2019), I.A. (2020), | ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| PROVIDENCE HEALTH & SERVICES WASHINGTON d/b/a PROVIDENCE ALASKA MEDICAL CENTER, BARBARA KNOX, MD, | ) ) ) ) ) |
| Defendant. | ) ) |
| _____ | ) Case No.: 4:22-cv-00017-SLG |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR EVIDENTIARY HEARING**

Dr. Knox, joined by Providence, argues that they are not state actors under section 1983, but even if they were, they are entitled to immunity based on a state statute.

As explained below, Defendants are state actors because they are paid by the state to perform a traditional state function and because there was no common law tradition of affording immunity for child abuse pediatricians who negligently

diagnose child abuse when section 1983 of the Civil Rights Act was passed in 1871, Defendants cannot claim qualified immunity to the federal civil rights claims. If the Court dismisses the federal law claims and retains jurisdiction to also decide the state law claims, there is a statutory exception to state law immunity for bad faith and bad faith is a jury question.

Dr. Knox (Knox) does not provide medical treatment to children. She was not I.A's treating doctor. Her job is to diagnose child abuse as a prerequisite for OCS to take custody of children away from parents or for law enforcement to pursue criminal charges. Dr Knox thereby plays an outsized role in the traditional governmental functions of prosecuting perpetrators of child abuse and taking custody of children from their parents. The latter function clearly could deprive parents of a fundamental constitutional right: the right to raise one's children without unreasonable government interference. The Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."[1]

As defendants point out, section 1983 liability requires that the constitutional deprivation results from a government policy and involves a person who can be considered a "state actor." "The test focuses on whether the state has 'so far insinuated itself into a position of interdependence with [the private actor] that it

_____

[1] <u>Troxel v. Granville</u>, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

must be recognized as a joint participant in the challenged activity.'"[2] The State of Alaska requires physicians to report suspected child abuse.[3] But for Knox diagnosing child abuse, OCS, who maintains offices within Alaska CARES (AC) and depends on Knox to distinguish cases of accidental trauma from abuse, does not take custody. In this case, Knox failed to properly consider the accidental causes of traumatic childbirth followed by stroke(s) and declared I.A. to be an abused child. OCS took custody and then relied on Knox as its expert witness to maintain custody.[4]

In this case it is clear that Dr. Knox was a joint participant in OCS taking custody away from the Ackers, and equally clear that this constitutional deprivation resulted from a government policy of removing children from parents deemed abusive by a child abuse pediatrician. Knox fulfilling the traditional government function of detecting child abuse resulted in the Ackers being deprived of their constitutional right to parent I.A. This conclusion is consistent with the <u>Sutton</u> case relied on by the Defendants, Mr. Sutton had refused to give his social security number to a prospective employer, citing religious concerns. The Ninth Circuit held that he satisfied the "government policy" prong by showing that the IRC and INS both required employers to collect SSN of employees.

---

[2] <u>Franklin v. Fox</u>, 312 F.3d 424, 445 (9th Cir. 2002)(Citations omitted).
[3] AS 47.17.020.
[4] Exhibit 1, 3/09/21 Dr. Knox's CINA testimony.

The court held:

> First, the deprivation must result from a governmental policy. See id. In other words, the deprivation "must be caused by the exercise of some right or privilege created by the [government] or a rule of conduct imposed by the [government]." *Lugar v. Edmondson Oil Co.*, Inc., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).
> Neither party disputes that the IRC and INS requirements that employers obtain their employees' social security numbers satisfy this criterion. Both are rules of conduct imposed by the federal government that caused Plaintiff's deprivation.[5]

Similar to Mr. Sutton's employer being bound to collect his SSN, Dr. Knox was bound by a rule of conduct imposed by the State, AS 47.17.020, to report suspected child abuse. She, and Providence, both satisfy the "state actor" prong under all four tests for achieving state actor status; (1) the public function test, (2) the joint action test, (3) the governmental compulsion test, and (4) the governmental nexus test.[6]

## DEFENDANTS SATISFY THE PUBLIC FUNCTION TEST BY FOLLOWING THE CHILD ADVOCACY CENTER (CAC) MODEL REQUIRING IT TO WORK TOGETHER WITH OCS TO INVESTIGATE ABUSE

According to Providence itself, AC works together with law enforcement and child protection to fulfill a traditional public function, investigate and prosecute child abuse:

> Alaska CARES is accredited by the National Children's Alliance as one of 881 child advocacy centers nationwide and one of 13 in Alaska. To be accredited, the nonprofit alliance requires a program to follow

---

[5] <u>Sutton v. Providence St. Joseph Medical Center</u>, 192 F.3d 826, 835-836 (9th Cir. 1999).
[6] <u>Id</u>.

its model and set up a "child-friendly facility in which law enforcement, child protection, prosecution, mental health, medical and victim advocacy professionals work together to investigate abuse, help children heal from abuse, and hold offenders accountable."[7]

## DEFENDANTS SATISFY THE JOINT ACTION TEST

The joint action test asks "'whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.' " *Id.* at 445 (quoting *Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1453 (10th Cir.1995)). This requirement can be satisfied either "by proving the existence of a conspiracy or by showing that the private party was 'a willful participant in joint action with the State or its agents.' " *Id.* (quoting *Collins v. Womancare,* 878 F.2d 1145, 1154 (9th Cir.1989)). Ultimately, joint action exists when the state has " 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity.' " *Gorenc v. Salt River Project Agric. Improvement & Power Dist.,* 869 F.2d 503, 507 (9th Cir.1989) (alteration in original) (quoting *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)).[8]

Defendants are joint participants with OCS in first detecting child abuse at AC and then acting in concert, via providing written reports and expert testimony, to justify OCS depriving parents of custody. Providence is dependent on state funding to operate AC and is inextricably intertwined with the state via a memorandum of understanding that commits Dr. Knox and Providence to work closely with OCS.

---

[7] https://www.chausa.org/publications/catholic-health-world/archive/article/june-2020/alaska-cares'-holistic-treatment-helps-young-abuse-victims-recover-and-thrive
[8] Tsao v. Desert Palace, Inc., 698 F.3d 1128 (9th Cir. 2012).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR EVIDENTIARY HEARING
*Acker, et al. v. Providence, et al.*, 4:22-cv-00017-SLG
Page 5 of 34

Case 4:22-cv-00017-SLG   Document 87   Filed 02/26/24   Page 5 of 34

AC does not treat children. It is not a medical treatment facility. It would not exist but for its joint participation with OCS and law enforcement in executing the traditional government function of detecting child abuse and taking custody from parents.

OCS maintains public offices within AC and has so far insinuated itself into a position of interdependence with defendants that it must be recognized as a joint participant in the challenged activity. Dr. Knox qualifies as a state actor for purposes of §1983 liability by virtue of the significant amount of state money flowing to AC. According to the State of Alaska online checkbook,[9] the State wrote checks totaling $5,150,989.82 over the 3 fiscal years Dr. Knox served as the medical director of AC, between 2020 and 2022. The year Knox violated the Plaintiffs' civil rights (Fiscal Year 2021) AC received $3,364,771.53 in direct funding through the State.

Perpetuating allegations of Child abuse can also be very lucrative to hospitals hosting a child advocacy center. In this case alone, Providence billed the government a total of $374,928.45 for a hospital bed, tests and diagnostics performed on I.A.[10]

---

[9] Exhibit 2, FY 2020-2022 Checkbook Online, Alaska Department of Administration Division of Finance.
[10] Exhibit 3, PAMC I.A. 2103-2110, Providence Billing.

The financial reality for those making (Dr. Knox), and those enabling (Providence), dubious child abuse allegations is that there are significant sources of government funding available to the CAC itself, as well as lucrative referrals for testing and procedures performed by the CAC affiliated hospital.

During discovery, it was learned that although I.A. was not billed by AC, it was only because there had been a self-imposed "pause" in billing by AC during that time to address widespread institutional medicaid billing errors by Providence. Those billing errors were discussed during Cathy Heceknlively deposition.[11] Providence admits that it normally bills insurance for conducting child abuse examinations. This certainly includes children receiving Denali Kid Care insurance paid for by the State.

It was disclosed during the deposition that AC normally bills medicaid for "services" provided by Knox and AC. This additional financial link, on top of the multimillion dollar grants AC annually receives from the State, establishes. AC annually receives significant state funding and provides office space for OCS workers and police officers. Section 1983 liability attaches to Dr. Knox because she testified as an OCS expert in support of OCS's petition for custody as part of

---

[11] Exhibit 4, Heckenlively Transcript p. 55.

Case 4:22-cv-00017-SLG   Document 87   Filed 02/26/24   Page 7 of 34

her contractual commitment to OCS under the memorandum of understanding and her regular job duties at AC.[12]

> (citation and internal quotation marks omitted); see also *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961) ("[T]o fashion and apply a precise formula for recognition of state responsibility u nder the Equal Protection Clause is an impossible task which [t]his Court has never attempted.") (citation and internal quotation marks omitted); *Lugar*, 457 U.S. at 939 ("The Court suggested that that `something more' which would convert the private party into a state actor might vary with the circumstances of the case."); *Ouzts v. Maryland Nat'l Ins. Co.*, 505 F.2d 547, 550 (9th Cir. 1974) ("It is also a truism by now that there is no rigid formula for measuring state action for purposes of section 1983 liability."). Instead, "[c]ontemporary decisions stress the necessity of a close nexus between the state and the challenged conduct rather than application of a mechanistic formula." *Wagner v. Metropolitan Nashville Airport Auth.*, 772 F.2d 227, 229 (6th Cir. 1985) (emphasis added); see also *Grijalva v. Shalala*, 152 F.3d 1115, 1119 (9th Cir. 1998) ("In order to show that a private action is in fact state action, the plaintiff must show that there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.") (citation and internal quotation marks omitted), vacated on other grounds by 119 S.Ct. 1573 (1999). "Under any formula, however, the inquiry into whether private conduct is fairly attributable to the state must be determined based on the circumstances of each case." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999).[13]

There is clearly a close nexus between Dr. Knox's diagnosis of child abuse and OCS taking children from parents and  prosecutors charging parents with criminal child abuse. While we haven't yet been able to depose anyone from OCS,

---

[12] Exhibit 5, Memorandum of Agreement.
[13] Sutton v. Providence St. Joseph Medical Center, 192 F.3d 826, 835-36 (9th Cir. 1999).

Plaintiffs do not have the burden of establishing evidence until the moving party first does so. Knox has provided no evidence allowing the Court to find that OCS would not have taken custody of I.A. but for Dr. Knox reckless assertion that I.A. had suffered non-accidental trauma.

## DEFENDANTS ARE COMPULSED BY STATE LAW AND A MEMORANDUM OF AGREEMENT (MOA) WITH OCS TO INVESTIGATE AND REPORT SUSPECTED CHILD ABUSE AND TO COOPERATE WITH OCS IN ANY ENSUIING CINA CASE

AS 47.17.020 imposes a duty on defendants, punishable by prison, to report suspected cases of child abuse to OCS. The MOA, as discussed in more detail below, requires them to assist OCS with written reports and expert testimony to deprive parents of their constitutional right to parent their children. Specifically, AC is contractually obligated "consistent with the law, [to] provide reports and DVDs/CDs to law enforcement agencies, DOL, and OCS in a timely manner."[14]

Both AST and OCS are required to: "Provide management representation to attend Agency Management Team meetings for the purpose of evaluating and planning the Alaska CARES/Anchorage program."[15]

OCS manages, evaluates and plans the AC program. That fact, standing alone, should satisfy both the government compulsion and the governmental nexus tests for bestowing "state actor" status on Defendants.

---

[14] Dkt. 79-9, Exhibit I, p. 3.
[15] Dkt. 79-9, Exhibit I, p. 5.

**THE FACTS OF THIS CASE SATISFY THE GOVERNMENTAL NEXUS TEST**

There are several accreditation standards for child advocacy centers, which AC must meet. Those standards require a close nexus between Providence staff and multiple government entities. "The core MDT (multidisciplinary team) must be composed of representatives from law enforcement, child protective services, prosecution, medical providers, mental health providers, victim advocates, MDT leadership, and CAC staff."[16] These accreditation standards establish how medical providers like Dr. Knox are required to assist OCS and prosecutors. The role of medical providers is outlined in the standards as follows:

Medical Providers

- History and other information obtained during the coordinated forensic interview prevents unnecessary duplication of effort and guides medical decisions.

- Provide consultation on specialized medical evaluations and interpretation of medical findings and reports. [17]

The close nexus between the medical provider and government agencies inherent in an accredited CAC is outlined in the standard making clear it doesn't matter whether a CAC is housed in a private hospital or in a government building. Regardless of whether a private or government entity provides the workspace, the

---

[16] Dkt. 79-5, Exhibit E, p. 14.
[17] Dkt. 79-5, Exhibit E, p. 15.

medical provider is required to work closely with and assist child protection and

law enforcement agencies at every stage.

> CAC organizational structure depends upon the unique needs and resources of its community; it may be an independent nonprofit agency, a component of an umbrella organization such as a hospital or nonprofit human service or victim service agency, or part of a governmental entity, such as prosecution, social services, or law enforcement. Each of these options has strengths, limitations and implications for collaboration, planning ,governance, community partnerships and resource development. Regardless of where the program is housed or under what legal auspices, all CACs must create a structure such that participating agencies feel equal investment in, and collaborative responsibility for, its operations and services.[18]

Here the State provided over 5 million dollars to AC during Knox's short

tenure there and the building has dedicated offices for OCS and AST employees.

> According to OCS' website:

> It is the role of the CAC to provide a child-focused, neutral, community-oriented program in which representatives from many disciplines meet to provide a comprehensive approach to the investigation, assessment, treatment, and prosecution of child abuse cases. The CAC provides a facility for: • Legally sound forensic interviews of children who may have been sexually abused, physically abused, severely neglected, drug endangered, or who may be a witness to violence, plus others depending on the resources of the CAC and MDT.[19]

It is clear that the role of AC and Dr. Knox is to help OCS investigate and

prosecute child abuse cases.

---

[18] Dkt. 79-9, Exhibit I.
[19] https://dfcs.alaska.gov/ocs/Documents/childrensjustice/MDTguidelinesV2.pdf

## THE MEMORANDUM OF AGREEMENT BETWEEN AC AND SEVERAL STATE AGENCIES ESTABLISH THE CLOSE NEXUS

The MOA between AC and various state agencies is summarized as follows:

MEMORANDUM OF AGREEMENT Between Providence Health & Services-Washington d/b/a/Alaska CARES(CAC)State of Alaska Office of Children's Services (OCS)The Anchorage Police Department(APD)The Anchorage Municipal Prosecutor's Office Alaska State Troopers (AST)Department of Juvenile Justice (DJJ)State of Alaska Department of Law/District Attorney's Office (DA) & The Attorney General's Office (AG)Anchorage School District (ASD)State of Alaska Department of Administration-Office of Public Advocacy I. Background and Purpose: Alaska CARES (Child Abuse Response and Evaluation Services) is a Child Advocacy Center (CAC) and an accredited member of the National Children's Alliance. The CAC is administered by Providence Health & Services with funding from various federal and state organizations including Southcentral Foundation (SCF) and the State of Alaska, Department of Health and Human Services, with the advice and cooperation of municipal and state investigators, prosecutors, child protection workers, and other community agencies. Alaska CARES serves as a locus for conducting evaluations of abused children, including sexually and physically abused children; conducting joint investigations and tracking of cases, and providing statewide training in the area of child abuse and child sexual abuse/assault. The CAC's success depends on the collaboration of the following key agencies, who are the signatories to this Memorandum of Understanding: the Anchorage Police Department (APD), the Alaska State Troopers(AST), the Alaska Office of Children's Services (OCS), the Alaska Department of Law-criminal and civil divisions (DOL), and Providence Health & Services (PH&S).[20]

AC, and its medical director Dr. Knox, serves as the locus for conducting

investigations and tracking cases and its success depends on the collaboration of

OCS, AST, and Providence. How can that undeniable truth not qualify as a "close

---

[20] Exhibit 5, Memorandum of Agreement.

nexus" for purposes of finding that Dr. Knox is a state actor for purposes of section 1983? It is the epitome of a close nexus.

The MOA contract between AC and the state agencies outlines the roles of each agency when performing the traditional state function of child protection. AC is contractually obligated "consistent with the law, [to] provide reports and DVDs/CDs to law enforcement agencies, DOL, and OCS in a timely manner."[21]

Both AST and OCS are required to: "Provide management representation to attend Agency Management Team meetings for the purpose of evaluating and planning the Alaska CARES/Anchorage program."[22]

With multiple state agencies being required to provide managers to attend management meetings and evaluate and plan the AC program, it is hard to fathom how Knox, AC's medical director, does not have a close enough nexus with the State of Alaska to be deemed a state actor under applicable case law.

The MOA clearly proves the close nexus required to impose section 1983 liability on Knox and providence.

The fact that Dr. Knox's opinions were relied upon by OCS to deprive the Ackers of their constitutional right to custody of their child is evidenced by the following paragraph in OCS's petition for emergency custody:

---

[21] Dkt. 79-9, Exhibit I, p. 3.
[22] Dkt. 79-9, Exhibit I, p. 5.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR EVIDENTIARY HEARING
*Acker, et al. v. Providence, et al.*, 4:22-cv-00017-SLG
Page 13 of 34

Case 4:22-cv-00017-SLG   Document 87   Filed 02/26/24   Page 13 of 34

On January 2, 2021 Dr. Barbara Knox from AK Cares consulted on this case. It was determined the child suffered trauma to the head and that the injuries including the skull fracture and the bleeding in the brain were from a recent injury. Dr. Knox will be consulting with Neuro radiologists at Providence Hospital on Monday January 4, 2021.[23]

Dr. Knox was called to testify as an expert for OCS in the Acker's CINA case.[24] She corresponded heavily with the assigned AG Susan Mitchell, prior to the hearing. Ms. Mitchell supplied Dr. Knox with confidential police reports and social worker's reports from Arizona involving an investigation regarding the Ackers. Such records would be irrelevant with regard to her opinion about I.A.'s head injuries but shows how closely Dr. Knox works as OCS' expert to support their legal position.[25] Knox is not truthful. In the Acker's CINA hearing, Dr. Knox testified under oath as follows:

Q- Why did you leave your position there [UWM]?

A- I left because I had been actively recruited to Alaska, and this is really an amazing job for me, so I left because of recruitment to this great state.
[26]

This answer is demonstrably false. Knox was placed on admin leave at UWM, told not to report for work and was denied access to her office and her former coworkers for several months before she entered into a settlement agreement.

---

[23] Exhibit 6 at p. 2, ACKER/DOE 4684-4688, Emergency Petition for Adjudication of Child In Need of Aid and for Temporary Custody.
[24] Exhibit 1, 3/09/21 Dr. Knox's CINA testimony.
[25] Exhibit 7, emails between Mitchell and Knox.
[26] Exhibit 1 p. 12, 3/09/21 Dr. Knox's CINA testimony.

Since Knox testified falsely in the CINA case, documents from her former employer, the University of Wisconsin, Madison, (UWM) have been revealed. This false testimony under oath, against the Ackers constitutional custodial rights, is more than sufficient to raise a jury question on the issue of bad faith to avoid statutory immunity, as further discussed below. Two of the documents that demonstrate Knox testified falsely against the Ackers are attached here as Exhibit 8, notice of suspension, and Exhibit 9, termination or severance agreement. Had Dr. Knox not lied under oath about her employment history, she may not have been recognized by the CINA judge as an expert. Had her history of false abuse allegations from Wisconsin not been hidden, her credibility as OCS's child abuse expert could have been challenged much more effectively.

Contrary to her testimony, Knox did not leave UWM because she was recruited to the great State of Alaska by Providence. She left because she had been placed on forced administrative leave and was going to be fired if she didn't resign.

That Knox was placed on administrative leave at both UWM and Providence is beyond dispute.[27] Regardless of her two previous placements on admin leave, Dr. Knox lied on her licensing application to the Florida Board of Medicine when

_____

[27] Exhibit 8 and 10, letters from UW and Providence.

she answered "no" to the question of whether she had ever been "asked to resign or take a temporary leave of absence or otherwise acted against by any facility."[28]

It is understood that Dr. Knox's history of lying in court and on job applications does not prove she was a state actor for purposes of section 1983 liability, but it does show why the Court should not rely on her affidavit as undisputed evidence and grant summary judgment to her.

## DR. KNOX IS NOT ENTITLED TO QUALIFIED IMMUNITY

Dr. Knox is not entitled to qualified immunity as medical director of AC, she functioned as a state actor in child protection cases pursuant to a detailed memorandum of agreement (MOA) AC has entered into with multiple state agencies. Dr. Knox's close nexus to OCS was especially evident in I.A.'s CINA case where Dr. Knox served as OCS's expert witness without a retainer agreement or excess remuneration. [29]

> When a private party asserts entitlement to qualified immunity, the Supreme Court instructs that courts: 1) Look for a firmly rooted history of immunity for similarly situated parties at common law; and 2) determine whether granting immunity would be consistent with the purpose of affording such immunity.[30]

---

[28] Exhibit 11, Knox's Florida Board of Medicine Licensing application.
[29] Exhibit 12, Knox's answers to Interrogatory No. 11, and Exhibit 1, 3/09/21 Dr. Knox's CINA testimony.
[30] Filarsky at 384, 132 S. Ct. 1657.

In <u>Filarsky</u>, the Court held that, to determine whether a defendant may assert qualified immunity, "we look to the 'general principles of tort immunities and defenses' applicable at common law, and the reasons we have afforded protection from suit under § 1983."[31]

Applying the test the court created in <u>Filarsky</u> , the Sixth Circuit has already determined that there is not a firmly rooted history of immunity for private physicians working part-time for a state institution. In <u>McCullum v. Tepe</u>, 693 F.3d 696, 703 (6th Cir. 2012). In <u>McCullum</u>, the Sixth Circuit explained that "[t]here is little directly applicable case law. But the precedents that do exist point in one direction: there is no special immunity for a doctor working for the state."[32]

> Based on its historical analysis, the Sixth Circuit determined in <u>McCullum</u>:
> These cases, as well as the American and English cases involving private physicians in private practice, and the absence of any indicia that a paid physician (whether remunerated from the public or private fisc) would have been immune from suit at common law, convince us that there was no common-law tradition of immunity for a private doctor working for a public institution at the time Congress passed § 1983.[33]

Section 1983 was passed in 1871.

In <u>Gokor v. Schlievert</u>,[34] a child abuse pediatrician working in a private hospital who contracted with the local children's services agency to provide

---

[31] <u>Id</u>. (Internal citations omitted).
[32] <u>Gokor v. Schlievert</u>, 474 F. Supp. 3d 929 (N.D. Ohio 2020).
[33] <u>McCullum v. Tepe</u>, 693 F.3d 696, 704 (6th Cir. 2012).
[34] 474 F. Supp. 3d 929 (N.D. Ohio 2020).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY
JUDGMENT AND REQUEST FOR EVIDENTIARY HEARING
*Acker, et al. v. Providence, et al.*, 4:22-cv-00017-SLG
Page 17 of 34

forensic exams and follow up testimony in child protection cases was not immune

from a 1983 suit alleging malicious prosecution. The court stated:

> In this respect, then, Schlievert's challenged conduct overlaps entirely with the State's motivations and goals. He functions as a critical player in the State's comprehensive – and entirely understandably comprehensive – efforts to combat child abuse, one on whom other arms of the state – Children Services, police departments, and prosecutors – depend and from whom they take their investigatory and charging cues.

> As one court has aptly put it, someone like Dr. Schlievert – a private doctor to whom the State has essentially turned over the responsibility for providing a medical basis to support or refute a claim of possible child abuse – is "truly ... close[ly] entwine[d]" with the State for purposes of § 1983's state-action requirement:

> [I]t is not merely tautological, but rather a truism, to recognize that a "state actor" is someone who participates in "state action" in a meaningful way. Take the governmental function of seeking to prevent, or to deal with, child abuse. It would of course be intolerable to permit amateurs – lay personnel – to reach judgments independent of skilled medical evaluations and to make those amateur judgments the basis for separating children from their parents. Instead the expertise of medical professionals necessarily plays a key role – in many ways, the most important role – in evaluating both the effects and the causes of child abuse.

> In short, it cannot be disputed that the governmental task in the field of child abuse could not function responsibly
> without the invaluable input provided by medical professionals. And when those professionals are not themselves governmental employees, it is equally beyond dispute that the interrelationship between those professionals and the purely governmental people involved in the [decision making] process is truly a close entwinement (the word repeatedly used in *Brentwood* Academy as meeting the state-actor test). Whether because the recruiting of top people to fulfill the medical professionals' function on a full-time basis would not have been feasible, or for some other reason or congeries of reasons, that

PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY
JUDGMENT AND REQUEST FOR EVIDENTIARY HEARING
*Acker, et al. v. Providence, et al.*, 4:22-cv-00017-SLG
Page 18 of 34

Case 4:22-cv-00017-SLG   Document 87   Filed 02/26/24   Page 18 of 34

is obviously why the Committee contracted for such service from Dr. Glick and the Hospital, rather than hiring staff doctors (who would by definition have been "state actors").

*Mohil v. Glick* , 842 F.Supp.2d 1072, 1077 (N.D. Ill. 2012) ; *accord Billups v. Penn State Milton S. Hershey Med. Ctr.* , 910 F.Supp.2d 745, 757 (M.D. Pa. 2012) (private doctors who examined child in county's custody "for the purpose of determining whether her injuries were the result of criminal activity" were state actors under the nexus test); *A.P. v. Medina* , 2018 WL 3546195, *3 (D.N.J. 2018) (private doctor who was "the primary medical investigator on behalf of the State" and examined a child "to determine whether his injuries resulted from abuse" was a state actor under the nexus test).[35]

After the District Court in <u>Gokor</u> denied the motion to dismiss, discovery ensued and Dr. Schlievert later filed a motion for summary judgment which was also denied. In finding that a rational juror could find that Dr. Schlievert made a recklessly false statement that resulted in a malicious prosecution of a daycare employee (Gokor) the court held:

If the jury found that Dr. Schlievert deliberately ignored a "statement that may support the situation," *i.e.,* a notation in the medical record that J.J. told a nurse practitioner that he slipped and fell, it could also find his distorted description of the record, barren as it was even of J.J.'s statement and based, as it was, merely on a paper review, to have been deliberately or recklessly false.[36]

The facts in <u>Gokor</u> seem identical to the facts here: both involve child abuse pediatricians (a specialty that did not even exist when the Civil Rights Act was passed in 1871) and both child abuse pediatricians chose to ignore facts pointing

---

[35] <u>Gokor v. Schlievert</u>, 335 F. Supp. 3d 972, 983-84 (N.D. Ohio 2018).
[36] <u>Gokor v. Schlievert</u>, 474 F. Supp. 3d 929, 937 (N.D. Ohio 2020).

to an accidental cause. Knox has to prove that no reasonable juror could find that her child abuse diagnosis was deliberately or recklessly false.

The <u>Mohil</u> case cited above, is particularly aligned with the current facts. The doctor who diagnosed child abuse in that case was considered a state actor under the "nexus" test even though they were not under contract to the state, as was Dr. Schleivert in the <u>Gokor</u> case. The <u>Mohil</u> court showed that a contractual relationship is not required for the governmental nexus test to be met:

> Nor is there any legitimate basis for arguing that different treatment, or a different analysis, is called for because Olivia does not reside in Chicago and therefore was not evaluated when Dr. Glick and the Hospital might be said to have been wearing their contractual hats. There is no gainsaying the fact that they were brought into the process for exactly the same reason, and to perform exactly the same function, as under the contract, and to do so precisely because their expertise was vital to, and an integral part of, the governmental act—and therefore they are by definition "state actors" for Section 1983 purposes.[37]

Whether or not Dr. Knox and/or Providence was under contract with the State, AC received over 5 million dollars from the State during the three years of Knox's tenure there. The result in <u>Gokor</u> cannot be distinguished simply because there may not be a formal contract for Providence to provide opinions about child abuse cases to OCS.

---

[37] <u>Mohil v. Glick</u>, 842 F. Supp. 2d 1072, 1077 (N.D. Ill. 2012).

Attached as Exhibit 13 is the expert report of Dr. Scheller who opines that Dr. Knox failed to consider birth trauma, combined with a later stroke, as a benign cause of I.A.'s injuries. Dr. Scheller's opinion is not technically an affidavit but it should be considered "other evidence" for purposes of Fed. R. Civ. P. 56. In an abundance of caution, Plaintiffs request an evidentiary hearing so that their case is not dismissed for failure to produce sworn evidence in their written opposition to Summary Judgment. At the hearing, Dr. Scheller can testify under oath and other sworn evidence can be presented.

In this case, Plaintiffs have not been able to determine whether OCS ever contracted with AC or Dr. Knox for her services, or whether they pay rent or other expenses related to their full-time office presence at AC, despite diligent discovery attempts, it should be uncontradicted that the State provided significant compensation to AC in the form of grants totaling $5,150,989.82 during the years Dr. Knox worked there. Dr. Knox, like Dr. Schlievert, does not treat patients. Her job is to evaluate potential abuse cases and render a medical opinion that OCS, and law enforcement, rely on. The result from that case, denial of Summary Judgment, should also apply to this case.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR EVIDENTIARY HEARING
*Acker, et al. v. Providence, et al.*, 4:22-cv-00017-SLG
Page 21 of 34

Case 4:22-cv-00017-SLG   Document 87   Filed 02/26/24   Page 21 of 34

Similarly, in <u>McCullum v. Tepe</u>,[38] the Sixth Circuit held a privately employed psychiatrist working for the public in a prison was not entitled to qualified immunity against a 1983 claim.

> Timothy Hughes died after hanging himself from his bed in the Butler County Prison. Hughes showed no outward signs that he was suicidal, but he did have a history of depression and asked to see Dr. Kenneth Tepe, the prison psychiatrist, about anti-depression medication. Hughes and Dr. Tepe never met. Hughes's mother filed this § 1983 suit, alleging that Tepe was deliberately indifferent to her son's serious medical need. Tepe sought summary judgment, arguing that he was entitled to qualified immunity. The district court held that Tepe could not assert a qualified-immunity defense. We agree. There does not seem to be a history of immunity from suit at common law for a privately paid physician working for the public, and the policy rationales that support qualified immunity are not so strong as to justify our ignoring this history, or lack of history. We therefore affirm the district court's decision denying Tepe's request for qualified immunity.[39]

The Sixth Circuit cited to Supreme Court precedent establishing that the relevant inquiry is whether there was a common law tradition of immunity established prior to the passage of section 1983 as part of The Civil Rights Act of 1871.

> [W]hether a person in the same position as the party asserting qualified immunity would have been immune from liability under the common law of the late Nineteenth Century. *See id.* at 1662 ("Under our precedent, the inquiry begins with the common law as it existed when Congress passed § 1983 in 1871."); *Wyatt,* 504 U.S. at 164, 112 S.Ct. 1827 ("If parties seeking immunity were shielded from tort liability when Congress enacted the Civil Rights Act of 1871—§ 1

---

[38] <u>McCullum v. Tepe</u>, 693 F.3d 696 (6th Cir. 2012).
[39] <u>Id</u>. at 697.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR EVIDENTIARY HEARING
*Acker, et al. v. Providence, et al.*, 4:22-cv-00017-SLG
Page 22 of 34

Case 4:22-cv-00017-SLG   Document 87   Filed 02/26/24   Page 22 of 34

of which is codified at 42 U.S.C. § 1983—we infer from legislative silence that Congress did not intend to abrogate such immunities when it imposed liability for actions taken under color of state law.").

With this in mind, we consider whether a private doctor working for a state institution would have been immune from a suit for damages at common law. In England, " *mala praxis* [was] a great [misdemeanor] [sic] and offence at common law, whether it be for curiosity and experiment or by neglect; because it breaks the trust which the party had placed in his physician, and tends to the patient's destruction." 4 William Blackstone, Commentaries, *122; *see also Dr. Groenvelt's Case,* (1697) 91 Eng. Rep. 1038 (K.B.) (discussing the case a of doctor imprisoned for malpractice); Andrew A. Sandor, *The History of Professional Liability Suits in the United States,* 163 J. Am. Med. Ass'n 459, 459 (1957) (citing English civil medical-malpractice cases decided as early as 1374). Bishop is correct that there is little British civil-malpractice case law. However, contrary to Bishop's unsupported speculation, it does not appear that doctors generally enjoyed any special kind of immunity. *See* Sandor, *supra,* at 459 (collecting cases).

The first reported American medical-malpractice case appears to be *Cross v. Guthery,* 2 Root 90, 1794 WL 198 (Conn.Super.1794). There, a man retained a doctor to perform surgery on a tumor in his wife's breast. The doctor "promised to perform [the] operation with skill and safety to the wife of the plaintiff," but instead "performed said operation in the most unskillful, ignorant and cruel manner, contrary to all the well-known rules and principles of practice in such cases; and ... after said operation, the plaintiff's wife languished for about three hours and then died of the wound given by the hand of the defendant." *Id.* at *1. The plaintiff recovered forty pounds for the loss "of the service, company and consortship of his said wife." *Ibid.* Although the doctor defended vigorously, he did not argue that he was immune from damages because he was a doctor.

But the doctor in *Cross* was a private doctor working for a private client. Tepe was a private doctor working for a public institution. Hence, the question: even if doctors generally had no immunity at common law, what of a private doctor who, like Tepe, worked for the government? There is little directly applicable case law. But the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR EVIDENTIARY HEARING
*Acker, et al. v. Providence, et al.*, 4:22-cv-00017-SLG
Page 23 of 34

Case 4:22-cv-00017-SLG   Document 87   Filed 02/26/24   Page 23 of 34

precedents that do exist point in one direction: there was no special immunity for a doctor working for the state.

In *Landon v. Humphrey,* 9 Conn. 209, 1832 WL 76, at *1 (Conn. June 1832), a doctor contracted with the town of Salisbury to vaccinate residents against "small or kine pox." The doctor, or his agent, "so unfaithfully, unskillfully and ignorantly treated the plaintiff, that he cut a tendon, cord, ligament and nerve of the plaintiff's arm and inoculated her in an improper, unusual and dangerous place on her arm." *Ibid.* The plaintiff won damages at trial, and the Supreme Court of Errors of Connecticut affirmed. The defendant raised a number of objections, but neither he nor the court mentioned immunity. Similarly, the Kentucky Court of Appeals—Kentucky's highest court until 1976— affirmed a money judgment against a doctor, hired "at the instance of a neighboring justice of the peace, acting for the county ... [and] under instructions to give his patient all necessary attention, but not to run the county to unnecessary expense." *Williams v. Nally,* 45 S.W. 874, 874 (Ky.Ct.App.1898). The doctor had treated a man with a broken leg, but "because the wound was unskillfully attended to ... gangrene set up in the foot of the patient, and amputation of his leg became necessary." *Ibid.* The doctor defended by arguing that a number of jurors were biased and that the plaintiff was responsible for the gangrene because he failed to follow instructions. But neither the doctor nor the court mentioned immunity. Last is *DuBois v. Decker,* 130 N.Y. 325, 29 N.E. 313 (1891). There, a man undertook to jump onto an engine of the Ulster and Delaware railroad, in the city of Kingston, and in doing so slipped, and his left foot was caught by a tender and a portion thereof crushed. Being destitute, he was taken to the city alms-house, where he was treated by ... one of the city physicians having the care of the patients therein.... Thereafter ... [the physician] amputated the plaintiff's leg above the ankle joint, and six or seven days thereafter, gangrene having set in, he again amputated the leg at the knee joint. After the second amputation the leg did not properly heal, but became a running sore, and at the time of the trial the bone protruded some three or four inches. *Id.* at 314. The physician defended on a variety of grounds, including the principle that a doctor could not be liable for an error in judgment, the lower court's decision not to issue a favorable jury instruction, *ibid.,* and a number of evidentiary decisions at trial, *id.* at 315. The doctor also asserted that, because he "treated the plaintiff gratuitously, he is

PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR EVIDENTIARY HEARING
*Acker, et al. v. Providence, et al.*, 4:22-cv-00017-SLG
Page 24 of 34

Case 4:22-cv-00017-SLG   Document 87   Filed 02/26/24   Page 24 of 34

liable, if at all, only for gross negligence; which was refused." *Ibid.* The court responded:

It has been held that the fact that a physician or surgeon renders services gratuitously does not affect his duty to exercise reasonable and ordinary care, skill and diligence.

But we do not deem it necessary to consider or determine this question for it appears that the plaintiff's services were not gratuitously rendered. He was employed by the city as one of the physicians to attend and treat the patients that should be sent to the alms-house. *The fact that he was paid by the city instead of the plaintiff did not relieve him from the duty to exercise ordinary care and skill. Ibid.* (emphasis added). This last sentence is suggestive. The doctor in *DuBois* would have had a *stronger* claim to immunity than Tepe: the city, not a private company, paid his wage. Still, the doctor did not raise, and the court did not mention, immunity. Rather, the court held that, regardless of who paid the doctor, the standard of care was the same, and affirmed a money judgment in favor of the plaintiff.

These cases, as well as the American and English cases involving private physicians in private practice, and the absence of any indicia that a paid physician (whether remunerated from the public or private fisc) would have been immune from suit at common law, convince us that there was no common-law tradition of immunity for a private doctor working for a public institution at the time that Congress passed § 1983. The first piece of the *Richardson* analysis, then, suggests that we should not allow Tepe to assert qualified immunity.[40]

Defendants rely on <u>Blum v. Yaretsky</u> when asking your honor to dismiss this case on summary judgment. That case is clearly distinguishable. Justice Rehnquist explained the issue as follows:

Respondents represent a class of Medicaid patients challenging decisions by the nursing homes in which they reside to discharge or transfer patients without notice or an opportunity for a hearing. The

---

[40] <u>Id</u>. at 702-04.

question is whether the State may be held responsible for those decisions so as to subject them to the strictures of the Fourteenth Amendment.[41]

A nursing home is not a state actor just because it receives Medicare funds when sued for an alleged due process violation, but this case is different: defendants are state actors because they perform a traditional state function.

Dr. Knox has not shown that child abuse pediatricians whose malpractice (which must be assumed for purposes of summary judgment) causes a deprivation of someone's constitutional rights were accorded common law immunity prior to 1871 and therefore her qualified immunity argument must fail as a matter of law.

Even if the court finds that Dr. Knox did not contract with OCS and DPS to provide child abuse opinions and testify about them, the result should be the same. The Supreme Court in Richardson v. McKnight,[42] held that guards employed by a private prison corporation may not assert qualified immunity.

The guards to the private prison were paid by the private company while the prison received funds from the state. Here, part of Knox's job was to assist OCS and DPS in criminal and CINA cases and that Providence was the recipient of at least $5,150,989.82 in State funding during her tenure, these facts cannot be distinguished from those in Richardson.

---

[41] 457 U.S. 991, 993 (1982).
[42] 521 U.S. 399, 404–12, 117 S.Ct. 2100 (1997).

In <u>Davis</u>, the Eighth Circuit noted that no other Circuit has disagreed with the Sixth Circuits analysis and cited the following support:

> *Tanner v. McMurray*, 989 F.3d 860, 867 (10th Cir. 2021) ("No circuit that has considered this issue has uncovered a common law tradition of immunity for full-time private medical staff working under the color of state law."). See also *Est. of Clark v. Walker*, 865 F.3d 544, 550–51 (7th Cir. 2017) (agreeing with the Sixth Circuit that there "was no common-law tradition of immunity for a private doctor working for a public institution at the time that Congress passed § 1983" (citation omitted)), cert. denied, 138 S. Ct. 1285, 200 L.Ed.2d 471 (2018).[43]

## DR. KNOX IS NOT ENTITLED TO IMMUNITY UNDER STATE LAWS

Dr. Knox's reliance on AS 47.14.300(h) and AS 47.17.050. runs contrary to established Ninth Circuit law finding that State laws designed to confer immunity are not applicable to Federal section 1983 actions.

The Ninth Circuit explained why in a case in which the federal district had erroneously granted summary judgment to a private physician who recommended an involuntary commitment.

Dr. Robbins was a privately employed physician whose practice group contracted with an Oregon county to evaluate mental health patients for involuntary commitments. Mr. Jensen, after being released from his commitment, sued Dr. Robbins and others for depriving him of his civil rights. Dr. Robbins convinced a district court judge that he was not a "state actor" subject to 1983 liability. The Ninth Circuit reversed and remanded. On appeal Dr. Robbins argued,

---

[43] <u>Davis v. Buchanan Cnty.</u>, No. 20-2075 (8th Cir. Aug. 24, 2021).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR EVIDENTIARY HEARING
*Acker, et al. v. Providence, et al.*, 4:22-cv-00017-SLG
Page 27 of 34

Case 4:22-cv-00017-SLG   Document 87   Filed 02/26/24   Page 27 of 34

as Dr. Knox currently does, that a state law granting immunity to physicians in such circumstances, should also apply to a federal 1983 action. The Ninth Circuit quickly rejected the notion that a state law can prevent enforcement of a federal civil rights law enacted long before the state legislatures sought to immunize certain individuals from state law claims.

> Dr. Robbins argues that the State of Oregon has provided for immunity from criminal and civil liability when an individual acts pursuant to Oregon's involuntary commitment statute, so long as the person acts in good faith, on probable cause, and without malice. Or. Rev. Stat. § 426.280(5).
>
> This statute's current legislative history indicates that the statutory immunity at issue in this case first appeared as an amendment in the 1987 Session Laws. 1987 Or. Laws, vol. 2, ch. 903, § 31 (amending Or. Rev. Stat. § 426.280 to include immunity provisions of Or. Rev. Stat. § 426.280(5)); cf. 1985 Or. Laws, vol. 1, ch. 242, § 5, (amending Or. Rev. Stat. § 426.280 but including only immunity for state medical officers in the context of trial visits). The legislative history is very sparse. We have found no committee reports or legislative comments directly pertaining to this provision. We have been unable to uncover even a suggestion that Oregon has a "firmly rooted tradition" of immunity, which Congress would have abolished explicitly had it intended to do so. The parties have provided us no information on the historical foundations of the statute, nor anything to convince us that a 1987 Oregon statute, without more, can provide the "firmly rooted tradition" that the Supreme Court requires. Moreover, the parties have not offered, and we have not found, any definitive common law history of immunity outside of Oregon that would support a finding of qualified immunity here.[44]

Section 1983 of Title 42 provides:

---

[44] <u>Jensen v. Lane County</u>, 222 F.3d 570, 577 (9th Cir. 2000).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR EVIDENTIARY HEARING
*Acker, et al. v. Providence, et al.*, 4:22-cv-00017-SLG
Page 28 of 34

Case 4:22-cv-00017-SLG   Document 87   Filed 02/26/24   Page 28 of 34

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured …[45]

Section 1983 itself mentioned nothing about immunity and AS 47.14.300(h) and AS 47.17.050 are as inapplicable here as the Oregon immunity law addressed by the Ninth Circuit in <u>Jensen</u>.

These statutes only potentially apply to the state law claims. As to the state law claims, one statute specifically provides an exception for bad faith and here there is sufficient evidence for a reasonable juror to find bad faith.[46] If this Court addresses the state law claims, it should deny summary judgment.

## SUMMARY JUDGMENT CANNOT BE GRANTED ON THE STATE LAW CLAIMS BASED ON STATE IMMUNITY STATUTES

AS 47.14.300 only confers immunity for multidisciplinary teams assembled by OCS. AS 47.14.300. (a) states, "The department shall create multidisciplinary child protection teams to assist in the evaluation and investigation of reports made under AS 47.17 and to provide consultation and coordination for agencies involved in child protection cases under AS 47.10."

_____

[45] 42 U.S.C. §1983.
[46] Exhibit 13, and 14, Dr. Scheller and Dr. Gabaoff's expert reports, as well as Exhibit 1, Dr. Knox's false testimony at the CINA hearing.

Defendants, in their motion, do not clearly assert that Knox was acting at all times as part of a "team" covered by the statute. This is understandable because if she was part of the OCS "team" she would, by any definition, be a state actor. If she is on the OCS team, she is liable for the federal claims but potentially immune to the state law claims. If she is not on the OCS "team" she has a better argument against section 1983 liability but loses out on statutory immunity for state law claims. In her reply brief, she has to take a position: Is she on the OCS "team" or not for purposes of AS 47.14.300 immunity? She can't have it both ways.

AS 47.17.050 extends to mandatory reporters but contains a specific exception for bad faith and there is sufficient evidence of bad faith to go to the jury.[47] When assessing the applicability of a bad faith exception to a state law immunity statute, this Court cannot apply the less stringent federal court standard and instead must apply the much more stringent summary judgment standard that is the law in Alaska. In <u>Meyer</u>, the supreme court held:

> We review grants of summary judgment de novo. We must "determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment on the law applicable to the established facts." All factual inferences are drawn in favor of the non-moving party, and the existence of a dispute regarding any material fact precludes summary judgment.
>
> The party opposing summary judgment need not produce all of its evidence but instead must only show the existence of a genuine factual dispute. In rendering its summary judgment determination,

---

[47] Exhibit 13, and 14, Dr. Scheller and Dr. Gabaoff's expert reports.

the court should examine the pleadings, affidavits, and discovery answers to ascertain whether any genuine issues of material fact exist.[48]

The Meyer decision shows how difficult it is to sustain a grant of summary judgment in Alaska. In that case the trial judge granted summary judgment finding paternity against Meyer because the odds of his paternity were 99.98%. The supreme court reversed, finding that because Meyer denied having intercourse during the period of conception, that the issue of paternity was a jury question. The court clarified that the state law standard for granting summary judgment was considerably more stringent than the federal standard.

Determining bad or good faith in Alaska involves an objective component.[49]

"Objective good faith consists of acting in a manner that a reasonable person would regard as fair."[50] Dr. Scheller and Dr. Gabaeff have both authored opinions that would permit a reasonable juror to find that Dr. Knox was reckless (a state of mind often considered synonymous with the objective component of bad faith in Alaska) when she failed to consider benign causes of I.A.'s injuries. Failing to consider benign injury causes could cause a reasonable juror to conclude that Dr. Knox acted in a manner that was not fair, and therefore summary judgment is

---

[48] Meyer v. State, 994 P.2d 365, 367 (Alaska 1999).
[49] Erkins v. Alaska Trustee, LLC, 355 P.3d 516 (Alaska 2015).
[50] Casey v. Semco Energy, Inc., 92 P.3d 379, 384 (Alaska 2004).

not permissible under the Alaska law this Court must apply when considering statutory immunity.

## PROVIDENCE IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANY VICARIOUS INDEPENDENT LIABILITY CLAIM AGAINST IT

Providence was sued under theories of Respondeat Superior and Aided in Agency. These theories make Providence liable for Knox's civil right violations. Respondeat Superior is vicarious and requires the employer act in the course and scope but Aided in Agency does not. "Under Alaska law, aided-in-agency liability (outside the employee/supervisor relationship) is limited to situations whereby reason of his or her employment, the employee has substantial power or authority to control important elements of a vulnerable individual's life or livelihood."[51]

Aided in Agency was not addressed in Knox's motion or Providence's joinder.

Providence is also independently liable to the Plaintiffs for state law claims of negligent hiring and supervision. These state law claims against Providence also were not briefed, therefore the Court cannot grant summary judgment to Providence, especially under the stringent state standard for summary judgment as discussed above. To the extent the Court requires Plaintiffs to submit more than a mere scintilla of evidence to survive summary judgment dismissing the claims against Providence, Plaintiffs submit the expert report of Hospital Administration

---

[51] Ayuluk v. Red Oaks Assisted Living, Inc., 201 P.3d 1183, 1199 (Alaska 2009).

expert Dr. Hoffman.[52] Because this report is not in the form of a sworn affidavit, Dr. Hoffman can also testify under oath at the requested evidentiary hearing.

## CONCLUSION

Dr. Knox did not treat I.A. or any other child. She was the medical director of a facility that annually received millions in state money to evaluate children for child abuse. She was part of a team required to work closely with state law enforcement and social workers to investigate child abuse. Reporting suspected child abuse is required of physicians under Alaska law, and this required reporting amounts to governmental policy that led to the deprivation of the Plaintiffs constitutional due process rights. Providence and Knox fulfilled a traditional government function of detecting child abuse, and is a state actor under any of the four tests, especially the joint action and governmental nexus tests.

Qualified immunity does not apply, and state statutory immunity either requires that Knox be part of OCS' "team" or is subject to a bad faith exception which is generally a jury question in Alaska.

An evidentiary hearing should be held, after which the defendant's motion should be denied.

---

[52] Exhibit 15, Dr. Hoffman's expert report.

DATED this 26th day of February 2024.

KRAMER and COSGROVE
Attorney(s) for Plaintiff

By /s/ Michael C. Kramer_____
      Michael C. Kramer
      ABA #9605031

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via CM/ECF on February 26, 2024, on the following:

Chester D. Gilmore
chester@cashiongilmore.com
jennifer@cashiongilmore.com

Laura L. Farley
Timothy. Bowman
lfarley@farleygraves.com
tbowman@farleygraves.com
khelton@farleygraves.com
jwylie@farleygraves.com

      By: /s/ Arnell Tinajero
      Kramer and Cosgrove

PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR EVIDENTIARY HEARING
*Acker, et al. v. Providence, et al.*, 4:22-cv-00017-SLG
Page 34 of 34

Case 4:22-cv-00017-SLG   Document 87   Filed 02/26/24   Page 34 of 34